# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**Living Lands, LLC**,
a West Virginia Limited Liability Company
1000 5th Avenue, Suite 100
Huntington, WV 25701

      and

**D. C. Chapman Ventures, Inc.**
a West Virginia Business Corporation

      - **Plaintiffs**

      **v.**

**Jack Cline**,
an Individual West Virginia Resident

**Robert Lee Cline**,
an Individual West Virginia Resident

**Brady Cline Coal Co.**,
a dissolved West Virginia Business
Corporation, solely to the extent of its
undistributed assets, specifically including
the remaining limits of its available liability
coverage under liability insurance policies
covering it and its officers and directors by
Fidelity & Casualty Insurance Company
c/o The Continental Insurance Company
(successor in interest to Fidelity & Casualty
Insurance Company)

**B. & S. Contracting, Inc.**
a dissolved West Virginia Business
Corporation, solely to the extent of its
undistributed assets, specifically including
the remaining limits of its available liability
coverage under liability insurance policies
covering it and its officers and directors by
Boston Old Colony Insurance Company
c/o The Continental Insurance Company
(successor in interest to Boston Old Colony
Insurance Company)

      - **Defendants**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. ___3:20-cv-00275___

**COMPLAINT**

**COMPLAINT FOR:**

**(1) RECOVERY OF RESPONSE COSTS AND DECLARATORY RELIEF PURSUANT TO CERCLA §§ 107(a) AND 113(g);**

**(2) JUDICIAL ABATEMENT OF CONDITIONS THAT MAY PRESENT AN IMMINENT AND SUBSTATIAL ENDANGERMENT TO HEALTH OR THE ENVIRONMENT ARISING FROM THE PAST HANDLING OR DISPOSAL OF A SOLID WASTE OR HAZADOUS WASTE PURSUANT TO RCRA § 7002(a)(1)(B);**

**(3) JUDICIAL ABATEMENT OF A *PER SE* PUBLIC NUISANCE DECLARED BY THE GENERAL LAW OF WEST VIRGINIA;**

**(4) JUDICIAL ABATEMENT OF CONTINUING PUBLIC NUISANCE PURSUANT TO THE COMMON LAW OF WEST VIRGINIA; AND**

**(5) RESITUTION FOR UNJUST ENRICHMENT**

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **1** of **63** pages

Plaintiffs, Living Lands, LLC ("**Living Lands**" or "**L4C**") and D.C. Chapman Ventures, Inc., by and through its undersigned counsel, makes the following allegations upon knowledge as to themselves and upon information and belief as to all other matters:

## I.   *NATURE OF THIS CASE*:

**1.**   Beginning at least in the 1960's and continuing into the mid-1990's, the real property, purchased in 1999 and now owned in fee simple by Plaintiff D. C. Chapman Ventures, Inc. located within the Right Fork Spruce Run Watershed in Nicholas County, WV (hereinafter:  "**Subject Watershed**"), which real property is more particularly described as "the Spruce Run Coal Company Land" in Deed Book 128, Page 377, Hamilton District, in the Office of the County Clerk of Nicholas County, WV; and below the 2180 foot elevation contour interval described by the United States Geological Survey Widen Quadrangle 7.5 Minute Series topographic map, in Nicholas County, West Virginia" (hereinafter:   "**Subject Property**"), has been the site of underground coal mining and related mining operations on the surface of that land.

**2.**   Through their acts, omissions, violations of federal and state environmental and public health protection laws, and breaches of common law duties owed to Plaintiffs and the public at large, Defendants Jack Cline, Robert Lee Cline, Brady Cline Coal Co. and B. & S. Contracting (collectively "**Defendants**") have, by their coal mining and mining waste disposal operations on the **Subject Property** caused the release of toxic, noxious, harmful and hazardous contaminants into the subsurface soils, groundwater and surface waters of the **Subject Watershed**, which toxic contaminants have become present and threaten to become further present at, on, under, and emanating from the **Subject Property** and throughout the **Subject Watershed** downgradient of the **Subject Property**.

**3.**   Plaintiffs (as more particularly described with respect to each Cause of Action asserted

herein) bring this civil action to: **(a)** recover pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA" or "federal Superfund Act")**,** 42 U.S.C. § 9607(a), costs of responding (*i.e., "*response costs") to releases and threatened releases of hazardous substances into the environment at and emanating from the **Subject Property** and within the **Subject Watershed** incurred and to be incurred consistent with the National Oil & Hazardous Substances Pollution Contingency Plan, 40 C.F.R., Part 300 (hereinafter: "**National Contingency Plan**" or "**NCP**")[1]; **(b)** obtain judicial abatement of conditions at and emanating from the **Subject Property** that may present an imminent and substantial endangerment to health or the environment within the **Subject Watershed** arising from the past handling, storage or disposal of a solid waste or hazardous waste pursuant to RCRA § 7002(a)(1)(b), 42 U.S.C. § 6972(a)(1)(b), in a manner consistent with the requirements of the **National Contingency Plan**; **(c)** to secure judicial abatement of an on-going *Per Se Public Nuisance and a* public nuisance under the common law of West Virginia; all such judicial abatement binding and compelling Defendants, jointly and severally, timely and competently to undertake all actions necessary to address and abate the continuing public nuisance conditions and imminent and substantial endangerments to the public health, safety, welfare and the environment caused and contributed to by the past acts and omissions of Defendants committed in the course of their respective coal mining operations at, on, under and in the vicinity of the **Subject Property** in a manner consistent with the requirements of the **NCP**; **(d)** recover restitution under the law of Unjust Enrichment, for the benefits received by each Defendant resulting from Plaintiff's

---

[1] The **NCP**, which was originally promulgated in 1968 and greatly expanded in 1972 by the Administrator of the U.S. Environmental Protection Agency pursuant to the Spill Response provisions of Section 311 of the federal Clean Water Act, 33 U.S.C. § 1321, was in 1980, pursuant to the Congressional mandate in CERCLA § 105(a), 42 U.S.C. § 9605(a), re-promulgated to address the **Responses** (*i.e.,* the precise scope and nature of necessary and proper investigation and clean-up actions) appropriate to releases and threatened releases of hazardous substances that are the central focus of CERCLA.

incurrence of costs of responding to the harms to, loss of value of, and loss of water at the **Subject Property** that was caused by the acts and omissions of, and is the legal responsibility of, each of the Defendants; (**e**) recover Plaintiff **L4C's** reasonable litigation costs, non-exclusively including its attorney fees and costs, expert witness fees and costs, and litigation costs incurred in obtaining such relief pursuant to RCRA § 7002(e), 42 U.S.C. § 6972(e); (**f**) recover appropriate prejudgment interest pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a) and West Virginia law; and (**g**) for such other relief as this Court may deem necessary and proper.

## II.   *JURISDICTION AND VENUE*:

**4.**   This Court has **exclusive,** original jurisdiction over the subject matter of the Count One herein [*i.e.,* Plaintiff **L4C's** claims under CERCLA §§ 107(a) and 113(g), 42 U.S.C. §§ 9607(a) and 9613(g)] pursuant to CERCLA § 113(b), 42 U.S.C. § 9613(b), without regard to the amount in controversy or the citizenship of the parties.  This Court also has jurisdiction over the subject matter of the Count One herein pursuant to 28 U.S.C. § 1331.

**5.**   This Court has original jurisdiction over the subject matter of Count Two herein [*i.e.,* Plaintiff **L4C's** claim under RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B)] without regard to the amount in controversy or the citizenship of the parties pursuant to RCRA Section 7002(a), 42 U.S.C. § 6972(a), and 28 U.S.C. § 1331.

**6.**   This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' remaining causes of action because those claims are so related to the causes of action asserted in Counts One and Two herein that they form the same case and controversy under Article III of the United States Constitution.

**7.**   Pursuant to CERCLA § 113(b), 42 U.S.C. § 9613(b), and RCRA § 7002(a),

*LIVING LANDS, LLC, et al.* **v.** *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **4** of **63** pages

42 U.S.C. § 6972(a), venue lies in this Judicial District, since a substantial part of the acts, omissions, and events which are described herein and the imminent and substantial endangerments to health and the environment asserted herein have occurred and are occurring within this federal judicial district, and those acts, omissions, events and endangerments which give rise to claims of Plaintiff **L4C**, including the releases of hazardous substances and the discharges of solid waste, hazardous wastes and pollutants and contaminants into the environment within the **Subject Watershed**, have occurred and are occurring in this federal judicial district, causing harmful impacts and endangerments within this federal judicial district.

### III. *DEFINITIONS:*

**8.**   As used in this Complaint, the following terms are intended to, and shall, have the following meanings:

**a.**      Consistent with it usage within the definition of the term "**Disposal**" in CERCLA § 101(29), 42 U.S.C. § 9601(29), and in RCRA § 1004(3), 42 U.S.C. § 6903(3), a part of Subchapter A of RCRA, and consistent with its definition in 40 C.F.R. § 260.10 (but without regard to the provisions of RCRA Subtitle C, 42 U.S.C. §§ 6921-6939f) the term "**Discharge** or "**Hazardous Waste Discharge**" means the accidental or intentional spilling, leaking, pumping, pouring, emitting, emptying, or dumping of **Hazardous Waste** or **Hazardous Substance** into or on any land or water;

**b.** Consistent with its definition in CERCLA § 101(29), 42 U.S.C. § 9601(29), and in RCRA § 1004(3), 42 U.S.C. § 6903(3), the term "**Disposal**" means the **Discharge**, deposit, injection, dumping, spilling, leaking, or placing of any **Solid Waste** or **Hazardous Waste** into or on any land or water so that such **Solid Waste** or **Hazardous Waste** or any constituent thereof, may enter the **Environment** or be emitted into the air or discharged into any waters, including ground waters;

**c.** Consistent with CERCLA § 101(8), 42 U.S.C. § 9601(8), the term "**Environment**" means:  **(A)** the navigable waters, the waters of the contiguous zone, and the ocean waters of

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **5** of **63** pages

which the natural resources are under the exclusive management authority of the United States under the Magnuson-Stevens Fishery Conservation and Management Act; and **(B)** any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States;

    **d.** Consistent with its definition in CERCLA § 101(9), 42 U.S.C. § 9601(9), the term "**Facility**" means:  **(A)** any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft; or **(B)** any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel;

    **e.**    Consistent with its definition in CERCLA § 101(14), 42 U.S.C. § 9601(14), the term "**Hazardous Substance**" means:  **(A)** any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act; **(B)** any element, compound, mixture, solution, or substance designated pursuant to section 102 of this Act [*i.e.,* CERCLA]; **(C)** any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress); **(D)** any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act; **(E)** any hazardous air pollutant listed under section 112 of the Clean Air Act; and **(F)** any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act.  The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs **(A)** through **(F)** of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas);

    **f.** Consistent with its definition in RCRA § 1004(5), 42 U.S.C. § 6903(5), the term "**Hazardous Waste**" means a **Solid Waste**, or combination of **Solid Wastes**, which because of its quantity, concentration, or physical, chemical, or infectious characteristics **may-**

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **6** of **63** pages

(**A**) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(**B**) pose a substantial present or **potential** hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed;

[Bolding emphasis added]

**g.** Consistent with its definition in CERCLA § 101(33), 42 U.S.C. § 9601(33), the term "**Pollutant or Contaminant**" shall include, but not be limited to, any element, substance, compound, or mixture, including disease-causing agents, which after release into the environment and upon exposure, ingestion, inhalation, or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavioral abnormalities, cancer, genetic mutation, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring; except that the term "pollutant or contaminant" shall not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of paragraph (14) [of CERCLA § 101(14)] and shall not include natural gas, liquefied natural gas, or synthetic gas of pipeline quality (or mixtures of natural gas and such synthetic gas);

**h.** Consistent with relevant provisions of its definition in CERCLA § 101(22), 42 U.S.C. § 9601(22), the term "**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes: (**A**) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons; and (**B**) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine . . . .;

**i.** Consistent with its definition in CERCLA § 101(25), 42 U.S.C. § 9601(25), the terms "**Respond**" or "**Response**" means [mean] remove, removal, remedy, and remedial action, as those terms are defined in CERCLA § 101, 42 U.S.C. § 9601;

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **7** of **63** pages

**j.** Consistent with it definition in RCRA § 1004(26A), 42 U.S.C. § 6903(26A), the term "**Sludge**" means any solid, semisolid or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water supply treatment plant, or air pollution control facility or any other such waste having similar characteristics and effects;

**k.** Consistent with RCRA § 1004(27), 42 U.S.C. § 6903(27), the term "**Solid Waste**" means any garbage, refuse, **Sludge** from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, **mining**, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 402 of the Federal Water Pollution Control Act, as amended, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended [Bolding emphasis added];

**l.** Consistent with its definition in RCRA § 1004(33), 42 U.S.C. § 6903(33), the term "**Storage**", when used in connection with **Hazardous Waste**, means the containment of **Hazardous Waste**, either on a temporary basis or for a period of years, in such a manner as not to constitute **Disposal** of such **Hazardous Waste**.

## IV.  *THE PARTIES & THEIR RELATIONSHIPS TO THE SUBJECT PROPERTY*:

**9.**  Plaintiff Living Lands, LLC is a West Virginia Limited Liability Corporation with its principal place of business at 1000 5th Avenue, Suite 100, Huntington, WV  25701.  It is a West Virginia small business real estate investment, management, and redevelopment company. Plaintiff **L4C's** business model emphasizes real estate investments that involve the re-purposing or redevelopment of environmentally impaired real property as a part of a profit-producing, coordinated portfolio of environmentally responsible and sustainable future uses of formally environmentally impaired real property assets.

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **8** of **63** pages

**10.**   Plaintiff D. C. Chapman Ventures, Inc. is a West Virginia Business Corporation with its principal place of business in Nicholas County, West Virginia, within this federal judicial district. In two (2) separate purchases of real property begun in 1998 and completed in 1999 Plaintiff D. C. Chapman Ventures, Inc. acquired fee simple title to real property within the **Subject Watershed** that includes all of the **Subject Property**.  As of the date of filing of this Complaint, Plaintiff D. C. Chapman Ventures, Inc continues to hold fee simple title to that real property.

**11.**   Plaintiff D. C. Chapman Ventures, Inc. has never conducted or allowed any mining operations on the **Subject Property** or within the **Subject Watershed**, and has never benefited or achieved any operational cost-savings in any way from the mining operations and waste management decisions of the coal mining businesses and their operators that conducted mining operations in the past on the **Subject Property** or within the **Subject Watershed**.

**12.**   In the course of implementing it business plan, on January 14, 2019 Plaintiff **L4C** purchased from Plaintiff D.C. Chapman Ventures, Inc. and currently holds an option to purchase fee simple title to the **Subject Property**.  A true and correct copy of the Agreement for Option to Purchase Real Estate between Living Lands, LLC and D.C. Chapman Ventures, Inc. is attached hereto as **Exhibit 1** and incorporated herein by this reference.

**13.**   Pursuant to the terms of its Option Agreement with D.C. Chapman Ventures, Inc., Living Lands, LLC was afforded a forty-five (45) day period to complete its investigation of the **Subject Property**, specifically including the environmental conditions at and emanating from the **Subject Property** and to make its final determination regarding feasibility of the contemplated re-purposing or re-development of the **Subject Property.**  The Option Agreement allowed Living Lands, LLC to withdraw from the Option Agreement any time before the expiration of the stated, 45-day period.  If Living Lands, LLC elected, as it did, not to exercise its right to withdraw from

the Option Agreement, the Option Agreement includes:  **(a)** a commitment by Living Lands, LLC timely to commence and diligently to pursue appropriate legal actions to compel responsible persons or entities timely and competently to investigate and abate the adverse environmental conditions on or affecting the **Subject Property**; and **(b)** a provision that the Option Agreement thereafter becomes irrevocable by the Optionor (*i.e.,* D.C. Chapman Ventures, Inc.) and remains irrevocable until ninety (90) days after the entry of a final, non-appealable Order by a court of competent jurisdiction fully and finally resolving all claims brought by **L4C** as Optionee seeking the full investigation and abatement of adverse environmental conditions at, emanating from, or adversely affecting the **Subject Property** or its present and future uses against parties responsible or potentially responsible for such conditions.

14.  According to it terms, the Option Agreement, which became irrevocable in early March 2019, provides express authority for Plaintiff **L4C, acting in the name of the D.C. Chapman Ventures, Inc.**, to "investigate, assess, assert and prosecute, settle, assign, or otherwise resolve any legal or equitable claims, chooses in action or rights of action that the **Optionor** (*i.e.,* D.C. Chapman Ventures, Inc.) has or may have that relate, directly or indirectly, to injuries or damages arising, directly or indirectly out of:  **(i)** any condition of private nuisance or public nuisance, or any adverse environmental conditions at, emanating from, or adversely impacting in any way the present or future beneficial uses of the **Subject Property,** or **(ii)** any condition at or affecting the **Subject Property** that may present an endangerment to the public health, safety, welfare or the environment".

15.  Defendant Jack Cline, the former Chief Executive Officer ("CEO") of Brady Cline Coal Co., a dissolved West Virginia corporation, and a former operator of its coal mining facilities on the **Subject Property** and within the **Subject Watershed**, is a resident of Glade Springs, West

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **10** of **63** pages

Virginia.  As the CEO of Brady Cline Coal Co., Defendant Jack Cline was at all times relevant hereto directly and personally involved in and responsible for the operations of Brady Cline Coal Co., including its handling of mining waste and Acid Mine Drainage **Discharges** at and from the **Subject Property**, and he had and exercised the ultimate authority and responsibility within Brady Cline Coal Co. to direct and control all of its coal mining activities within the **Subject Watershed**, specifically including the company's mandated procedures to afford adequate protection of the public health, safety, welfare and the environment in the conduct of its mining operations, and to assure that the necessary financial and personnel resources are properly allocated, utilized and directed to secure timely, complete compliance with federal and state environmental and public health protection laws and regulations.  In addition, at all times relevant hereto, Defendant Jack Cline, as a Responsible Corporate Officer of Brady Cline Coal Co., had the authority and responsibility to oversee and direct the activities of the Chief Operations Officer of Brady Cline Coal Co. and his or her subordinates who were line officers of the company responsible for proper and lawful implementation of the design and operational implementation of the required environmental and public health protection measures required by applicable federal and state law.

**16.**   Defendant Robert Lee Cline, the former Chief Operations Officer ("COO") of Brady Cline Coal Co., a dissolved West Virginia corporation, and the former Chief Executive Officer of B & S Contracting, Inc., a dissolved West Virginia corporation, is a former operator of the mining facilities on the **Subject Property** and within the **Subject Watershed** of both of those companies and is a resident of Summersville, West Virginia.  As the COO of Brady Cline Coal Co., Defendant Robert Lee Cline was at all times relevant hereto directly and personally involved in the operations of Brady Cline Coal Co., including its handling of mining waste and Acid Mine Drainage discharges at and from the **Subject Property**.  Further, as the COO he had and exercised at all

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **11** of **63** pages

times relevant hereto the front-line principal authority and responsibility within Brady Cline Coal Co. to direct and control all of its design and operational activities required to effect the company's mandated protection of the public health, safety, welfare and the environment in the conduct of its mining operations, and to assure that the necessary financial and personnel resources are properly requested, utilized and directed to secure timely and complete compliance with federal and state environmental and public health protection laws and regulations.  In addition, at all times relevant hereto Defendant Robert Lee Cline, as a Responsible Corporate Officer of Brady Cline Coal Co., had the authority and responsibility to oversee and direct the activities of the line supervisors and other company personnel who had direct responsibility for proper and lawful implementation by Brady Cline Coal Co. of the design and operational standards of the environmental and public health protection measures required of it by applicable law.

17.  Defendant Brady Cline Coal Co. is a West Virginia Business Corporation that was dissolved by Court Order in 1994.  Prior to its dissolution, it conducted extensive coal mining operations on the **Subject Property** and within the **Subject Watershed**, and is named as a defendant herein solely to the extent of its undistributed assets, non-exclusively including the remaining limits of its available liability coverage under liability insurance policies issued to it and its officers and directors by Fidelity & Casualty Insurance Company, c/o The Continental Insurance Company (successor in interest to Fidelity & Casualty Insurance Company).

18.  Defendant B. & S. Contracting, Inc. is a West Virginia Business Corporation whose authority to conduct business within the State of West Virginia was revoked by the West Virginia Secretary of State in 1996.  Prior to the revocation of its authority to conduct business in West Virginia, it conducted coal mining operations that adversely impacted environmental conditions on the **Subject Property** and within the **Subject Watershed**, and is named as a defendant herein

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **12** of **63** pages

solely to the extent of its undistributed assets, non-exclusively including the remaining limits of its available liability coverage under liability insurance policies issued to it and its officers and directors by Boston Old Colony Insurance Company, c/o The Continental Insurance Company (successor in interest to Boston Old Colony Insurance Company).

## IV. *ALLEGATIONS COMMON TO ALL COUNTS*:

**a. THE SURFACE WATERS AND GROUNDWATERS WITHIN THE RIGHT FORK SPRUCE RUN WATERSHED IN NICHOLAS COUNTY, WV ARE "WATERS OF THE STATE" HELD IN TRUST BY THE STATE OF WEST VIRGINIA FOR THE BENEFICIAL USE OF PRESENT AND FUTURE GENERATIONS OF THE PUBLIC:**

19.  W. Va. Code § 22-11-3 defines the terms "Water Resources," "Water" and "Waters" of West Virginia for the purposes of the West Virginia Water Pollution Control Act, W. Va. Code, Chapter 22, Article 11 as:

> [A]ny and all water on or beneath the surface of the ground, whether percolating, standing, diffused or flowing, wholly or partially within this state, or bordering this state and within its jurisdiction, and includes, without limiting the generality of the foregoing, natural or artificial lakes, rivers, streams, creeks, branches, brooks, ponds (except farm ponds, industrial settling basins and ponds and water treatment facilities), impounding reservoirs, springs, wells, watercourses and wetlands

Consequently, the surface waters and groundwaters within the Right Fork Spruce Run Watershed in Nicholas County, WV are "Waters of West Virginia."

20.  With respect to its Waters, the State of West Virginia has clearly stated its public policy to protect the beneficial uses of those Waters for present and future generations of the public:

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **13** of **63** pages

(a) It is declared to be the public policy of the State of West Virginia to maintain reasonable standards of purity and quality of the water of the State consistent with (1) public health and public enjoyment thereof; (2) the propagation and protection of animal, bird, fish, aquatic and plant life; and (3) the expansion of employment opportunities, maintenance and expansion of agriculture and the provision of a permanent foundation for **healthy** industrial development.

(b) It is also the public policy of the State of West Virginia that the water resources of this State with respect to the quantity thereof be available for reasonable use by all of the citizens of this State.

WV Water Pollution Control Act, W. Va. Code § 22-11-2 [Bolding emphasis added]. Further,

West Virginia law provides:

The West Virginia Legislature further finds that it is the public policy of the State that the water resources of the State be available for the benefit of the citizens of West Virginia, **consistent with and preserving all other existing rights and remedies recognized in common law or by statute**, **while also preserving the resources within its sovereign powers for the common good.**

West Virginia Water Resources Protection and Management Act, W. Va. Code § 22-26-1(b)(2) [Bolding emphasis added].

21.  West Virginia has been equally clear in declaring its public policy to protect the beneficial uses of its groundwaters for present and future generations of the public:

[T]he Legislature establishes that it is the public policy of the State of West Virginia to maintain and protect the State's groundwater so as to support the present and future beneficial uses and further to maintain and protect groundwater at existing quality where the existing quality is better than that required to maintain and protect the present and future beneficial uses. Such existing quality shall be maintained and protected unless it is established that (1) the measures necessary to preserve existing quality are not technically feasible or economically practical and (2) a change in groundwater quality is justified based upon economic or societal objectives. Such a change shall maintain and protect groundwater quality so as to support the present and future beneficial uses of such groundwater.

West Virginia Groundwater Protection Act, W. Va. Code § 22-12-2 (b) [Bolding emphasis added].

**b. THE QUALITY, SUSTAINABLE FUNCTIONING AND HEALTHFULNESS OF THE ENVIRONMENT ON, IN AND UNDER THE SUBJECT PROPERTY AND WITHIN THE SUBJECT WATERSHED HAS BEEN AND CONTINUES TO BE SUBSTANTIALLY AND ADVERSELY IMPACTED BY EACH OF THE DEFENDANTS' PAST MINING OPERATIONS ON THE SUBJECT PROPERTY AND WITHIN THE SUBJECT WATERSHED, NON-EXCLUSIVELY INCLUDING: (1) UNDERGROUND COAL MINING UNDERTAKEN WITHOUT APPROPRIATE MEASURES TO MITIGATE THE ENDANGERMENTS TO HEALTH AND THE ENVIRONMENT FROM RESULTING VOIDS, UNSEALED OPEN AND ABANDONED TUNNELS, SHAFTS AND ENTRYWAYS AND SUBSIDENCE; (2) THE HANDLING AND DISPOSAL OF RESULTING MINING WASTES; AND (3) ACID MINE DRAINAGE THAT HAS RESULTED AND CONTINUES TO RESULT FROM SUCH MINING OPERATIONS.**

22. The Right Fork Spruce Run watershed lies entirely within Nicholas County, West Virginia, within this federal judicial district, and its drainage area encompasses approximately 200 acres.  The Right Fork Spruce Run is a tributary of Spruce Run, of Brushy Fork, of Muddlety Creek, of Gauley River.

23. The Right Fork Spruce Run is "navigable waters" as that term is used in Section 502 of the Federal Water Pollution Control Act (commonly known as the federal "Clean Water Act"), 33 U.S.C. § 1362, because it is "waters of the United States" as that term is defined in 40 C.F.R. § 122.2.   It is also waters of West Virginia as that term is defined in W. Va. Code § 22-11-3.

24. Beginning in at least the 1960's and continuing into at least the 1990's, underground coal mining operations with associated surface operations on or below the **Subject Property** and beyond the boundaries of the **Subject Property** were conducted within the **Subject Watershed**. Each of the Defendants, together with the Spruce Run Coal Company and the Rifson Coal Co. that mined the **Subject Property** prior to the Defendants, conducted such coal mining activities at the **Subject Property** and within the **Subject Watershed** at various times during that period.

25. The three (3) following maps, created by the West Virginia Geologic and Economic

Survey with labeling added by Plaintiff **L4C**, present a true and accurate portrayal of the geographic relationship of the mining operations Defendant Brady Cline Coal Co. and of the Rifson Coal Co. within the **Subject Watershed** with relations to the other principal geographic features of that watershed:



*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **16** of **63** pages





26.  Each of the Defendants operated underground mines in the Stockton coal seam on the east

side of the Right Fork Spruce Run.  Defendants ceased operations and failed or refused to comply

with their environmental and mining permits, and forfeited their posted reclamation bonds, leaving the State of West Virginia with the task of reclaiming the site and permanently treating contaminated discharges to surface water from the operations.

27.   Both the subsurface mining and the related mining operations conducted on the surface of the **Subject Property** by each of the Defendants disturbed the hydrogeological environment at, on and under the **Subject Property** and within the **Subject Watershed** by changing hydraulic conductivity, secondary porosity, vertical connectivity, and geochemistry.   Each Defendant's mining activities and **Facilities** at, on and under the **Subject Property** caused and contributed to, and continue to cause and contribute to, the **Release** and **Discharge** of the mining waste **Pollutants and Contaminants** into the **Environment** which led to, and continues to lead to, the generation and Release of **AMD** at and emanating from each of the Defendants' historical, current, and improperly abandoned and closed mining **Facilities** at, on and under the **Subject Property**.   All such **Released AMD** contains increased acidity, iron, manganese, aluminum, iron hydroxide, sulfuric acid, and numerous other inorganic contaminants which seriously injure or destroy plant and animal life.

28.   Each of the Defendants' mining activities at, on and under the **Subject Property** increased aeration within the layers in and around the mined seams on the **Subject Property**. This aeration in effect jump-started and accelerated the oxidation of iron and sulfur minerals through chemical and biological processes.   While normally stable, sulfide and iron minerals are oxidized by microorganisms at reaction rates several orders of magnitude greater than non-biologically mediated processes.   Thus, while many of the elements required for oxidation of these minerals have been present since these layers were originally laid down, the introduction of air and more water into the subsurface through each of the Defendants' mining operations greatly

*LIVING LANDS, LLC, et al.* **v.** *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **18** of **63** pages

increased the rates at which these minerals are oxidized and are dissolved in groundwater by stimulating biological activity that continues to this day.  Additionally, each of the Defendants' mining waste disposal practices at, on and under the **Subject Property** and within the **Subject Watershed** similarly has increased, and continues to increase, the rates at which these mining waste **Pollutants and Contaminants** are introduced into the **Environment**.

29.  Each of the Defendants' mining **Facilities** and mining operations at, on and under the **Subject Property** created or contributed to conditions that have not been adequately controlled or mitigated at, on and under the **Subject Property** and within the **Subject Watershed** during or after such mining operations, non-exclusively including voids, open and abandoned tunnels and shafts, and subsidence which are in and of themselves hazardous to public welfare and safety, and which have been and remain a significant source of **AMD** in the **Subject Watershed**.

30.  Additionally, each of the Defendants' mining **Facilities** and mining operations at, on and under the **Subject Property** created or contributed to fracture zones associated with heaving of mine floors and roof falls that, in turn, cause or contribute to vertical fracturing, thereby connecting strata vertically from below the lowest mine works to the surface and greatly increasing secondary porosity in the mined area.  From a water supply standpoint, this fracturing dramatically changed the natural hydrogeologic system (flow of water within the environment) - from what was once a system dominated by shallow local aquifers defined by local topography to one in which vertical and horizontal connectivity is vastly increased.  This increase in fracturing and vertical and horizontal preferential pathways also has contributed, and continues to contribute, to significant adverse changes in local geochemistry, increased porosity, changes in groundwater flows and volumes, and increased contact area between solutes and solvents (*i.e.,* water).  Accordingly, each of the Defendants' mining Facilities and operations at, on and under the

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **19** of **63** pages

**Subject Property** has increased, and continues to increase, the connectivity of water contaminated by each of their mining activities to the surrounding groundwater and surface water environment within the **Subject Watershed**.

31. Each of the Defendants' mining activities in the **Subject Watershed** were conducted above drainage (*i.e.*, up-gradient of Right Fork Spruce Creek) in the Stockton coal seam; mining of which is notorious for contaminating groundwater and surface waters with toxic pollutants if either or both appropriate controls are not utilized throughout, during and after the coal mining process, or mining wastes are disposed above drainage in a manner that does not afford adequate protection of the **Environment**.  None of the Defendants properly utilized such controls and each Defendant **Disposed** of mining waste in unlined **Facilities**, including within the mine works, in unlined ditches, and in an unlined surface impoundment on the **Subject Property**; all of which were above drainage.

32. The Defendants past mining of the coal seams on the **Subject Property** and within the **Subject Watershed** without implementation of adequate **AMD**-mitigation measures and controls to prevent and mitigate adverse impacts on the **Environment** continue to be a source of **Solid Waste**, **Hazardous Waste** and **Hazardous Substance** contamination in the **Subject Watershed.** It is through the mined coal seams and mining activities by each of the Defendants that mining waste has been further exposed to air and water at and emanating from the mining **Facilities**, which exposure generated **AMD Solid Waste** and **Hazardous Waste** that caused or contributed to the disruption in the geological and hydrologic balance within the **Subject Watershed**.  Without adequate and effective mitigation and control measures, these disruptions in the geological and hydrologic balance within the **Environment** within the **Subject Watershed** from the mining activities of each of the Defendants on the **Subject Property** and within the **Subject Watershed**

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **20** of **63** pages

have caused or contributed to, and continue to cause or contributes to, the comingling of mine waste materials and oxidation of materials to create Acid Mine Drainage ("**AMD")** and its release into and **Disposal** at and within the Right Fork Spruce Run and Spruce Run Watersheds.  **AMD** contaminated water originates in the altered environmental conditions in the mined coal seams and migrates through the seams and adjacent rock layers and into the groundwaters and surface waters of the Right Fork Spruce Run Watershed.  The **AMD** and mining waste materials **Released** from these altered pathways are freed to comingle with **AMD** contamination **Released** from the mining waste piles and unlined ditches and impounds on the **Subject Property** and to further cause and contribute to the environmental degradation of the **Subject Watershed**.  Spruce Run is listed on the West Virginia Clean Water Act Section 303(d) List ("WV 303d") of "impaired waters" and has a completed Total Maximum Daily Load plan ("TMDL")[2] established by the West Virginia Department of Environmental Protection ("WVDEP") and approved by USEPA.

33.  Unpermitted **AMD Discharges** resulting from past mining activities in the Brady Cline Numbers 4 and 5 Mines and the Rifson Number 7 Mine Coal mining activities have caused and continue to cause serious and substantial impairments to the healthfulness and beneficial uses of the waters of the Right Fork Spruce Run and Spruce Run.  The following graphic accurately portrays the geographical area of the **Subject Property** and the locations and flow directions of the Right Fork Spruce Run, the prevailing groundwater gradient within the **Subject Watershed**, and the locations of the two **unlined** ditches on the **Subject Property.**

---

[2]  A "TMDL" is the calculation of the maximum amount of a pollutant allowed to enter a waterbody so that the waterbody will meet and continue to meet legally applicable water quality standards for that particular pollutant.  A TMDL determines a pollutant reduction target and allocates load reductions necessary to achieve that target to the contributing source(s) of the pollutant.



**34.**  Unlined Ditch # 1 portrayed in the graphic directly preceding this Paragraph runs along the former Haul Road on the **Subject Property** and **Discharges** into an **unlined** surface impoundment placed directly in the Right Fork Spruce Run.

**35.**  Upon information and belief, the unlined surface impoundment into which Unlined Ditch # 1 **Discharges** was originally created during Spruce Run Coal Co.'s mining operations on the **Subject Property** sometime in the 1960's.  This unlined surface impoundment was used by each of the Defendants to "treat" some of the influent **AMD** from each of their mining **Facilities** that drained into Unlined Ditch # 1 and other ditches and conveyances to the pond prior to **Discharging** some of that influent waters via a NPDES-permitted outfall directly to the Right Fork Spruce Run.  The remaining **AMD**, which was, at all times relevant hereto, and which remains to date influent to Unlined Ditch # 1 and to the unlined surface impoundment to which it is connected, was and is **Discharged** directly to groundwaters within the **Subject Watershed**.

**36.**  Unlined Ditch # 2 portrayed in the graphic immediately preceding Paragraph **34** discharges directly into the Right Fork Spruce Run.  Throughout and after each of the Defendants' operation of their mining **Facilities** on the **Subject Property** untreated **AMD** was **Discharged** via Unlined Ditch # 2 directly into:  **(a)** the surface waters of the Right Fork Spruce Run; and **(b)** the groundwaters within the **Subject Watershed**.

**37.**  The two (2) photographs following this Paragraph were taken on February 17, 2020 by a professional environmental engineer retained by Plaintiff **L4C** to conduct of a limited environmental investigation of the **Subject Property**.  Each such photograph accurately portrays conditions in Unlined Ditch # 2 on the **Subject Property**.  The first photograph portrays both **AMD** contaminated groundwater being **Discharged** into Unlined Ditch # 2 and **AMD** within Unlined Ditch # 2 being **Discharged** directly to Right Fork Spruce Run.  The second photograph portrays **AMD** contaminated surface water and sludge in Unlined Ditch # 2.





38. The mined coal seams on and immediately adjacent to the **Subject Property** continue to be a source of **Releases** of **AMD** contaminants into the **Environment** within the **Subject Watershed**. The past mining activities by each of the Defendants in the mined coal seams at, on and under the **Subject Property** and within the **Subject Watershed** conducted without implementing appropriate and effective **AMD** control and mitigation measures have resulted in voids, open and abandoned tunnels, shafts and entryways and subsidence at, on and under the **Subject Property** and within the **Subject Watershed** resulting from each of their coal mining operations. Moreover, the **AMD** resulting from these voids, open and abandoned tunnels, shafts and entryways and subsidence at, on and under the **Subject Property** have degraded and continue to degrade the **Environment** and have caused or contributed to a complete loss of the beneficial uses of the waters under and immediately adjacent to the **Subject Property**.

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **24** of **63** pages

39.  The past mining activities by each of the Defendants in the mined coal seams at, on and under the **Subject Property** and within the **Subject Watershed** measures have resulted in the generation of mining wastes at, on and under the **Subject Property** that each of the Defendants **Disposed** of at, on and under the **Subject Property** and within the Subject Watershed without implementing appropriate **AMD** control and mitigation measures.  By these acts and omissions of each of the Defendants, this mining waste has been and <u>continues</u> to be further exposed to air and water at and within the mining **Facilities** at, on and under the **Subject Property** and within the **Subject Watershed**, which exposure has caused or contributed to, and continues to cause and contribute to, the generation of **AMD** at and emanating from the **Subject Property** and the consequential degradation of the quality and healthfulness of the **Environment** at the **Subject Property** and within the **Subject Watershed** and the past and continuing disruption in the geochemical and hydrologic balance within the **Subject Watershed**.

40.  The aforementioned disruptions in the geochemical and hydrologic balance within the **Environment** at the **Subject Property** and within the **Subject Watershed** resulting from the mining activities of each of the Defendants continues to cause and contribute to the comingling of **Solid Waste** and the oxidation of materials in that **Solid Waste** within the exposed mining works and within the **Released** mining waste to create **AMD** and its **Release** and **Disposal** into the **Environment** at the **Subject Property** and within the Right Fork Spruce Run and Spruce Run Watersheds.

41.  In May 2018 groundwater seeps at and through the "closed" portals on the **Subject Property** created by and used during each of Defendants' past mining operations were sampled by environmental consultants for Plaintiff **L4C**.  The data generated by the laboratory analysis of those samples indicate that the on-going **Releases** and **Discharges** of **AMD** from each of the

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **25** of **63** pages

Defendants' past mining **Facilities** within the **Subject Watershed** contains; and the groundwater in the Right Fork Spruce Run Watershed is contaminated at least by, the following chemical substances:  arsenic, beryllium, cadmium, iron, antimony, manganese, selenium, sulfate and aluminum.

42.  Groundwater contaminated by past and on-going **AMD** discharges from the Defendants' former mining operations on the **Subject Property** originates in the altered environmental conditions in the coal seams and from **Releases** from mining waste at and from the **Subject Property** that was **Disposed** of within the **Subject Watershed** without implementation of adequate measures to protect the **Environment** and migrates through the seams and adjacent rock layers and into the groundwaters and surface waters of the Right Fork Spruce Run Watershed. These altered pathways and **Released** mining waste materials are freed to comingle and to further cause and contribute to the environmental degradation at and migrating from the mining facilities in the groundwater and surface waters of the **Subject Watershed**.

43.  Much of the contaminants contained in the unpermitted discharges from the Defendants' mining operations on the **Subject Property** and within the **Subject Watershed** enter directly into the groundwater and there forms a commingled, single plume of mine waste **Pollutants and Contaminants** within the groundwater aquifer within the **Subject Watershed** upgradient of the Right Fork Spruce Run, which groundwater has direct hydraulic connection to, and which discharges directly into, the surface water of the Right Fork Spruce Run.  The contaminants in Right Fork Spruce Run have contributed to and continue to contribute to the significant impairments of Spruce Run and Muddlety Creek, both of which are also:  **(a)** "navigable waters" as that term is used in Section 502 of the Federal Water Pollution Control Act (commonly known as the federal "Clean Water Act"), 33 U.S.C. § 1362, because each of them is a "waters of the

*LIVING LANDS, LLC, et al.* **v.** *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **26** of **63** pages

United States" as that term is defined in 40 C.F.R. § 122.2; **(b)** waters of West Virginia as that term is defined in W. Va. Code § 22-11-3; and **(c)** a WV § 303d listed "impaired stream."

**44.**   Some of the toxic, **AMD** contaminants contained in the unpermitted discharges from each of the Defendants' mining operations on and immediately adjacent to the **Subject Property** and within the **Subject Watershed** are also contained in waters flowing directly from mine portals that are simply covered with soil without the addition of any impermeable materials, which design allows water to flow through this permeable soil material.  In sum, the mine portals on the Subject Property are somewhat sealed to entry, but hydraulically unsealed.  These contaminated waters flow from the mine portals into the nearby Right Fork Sprue Run via ditches and gullies formed by the contaminated waters running over the surface of the land within the **Subject Property**. Once in the surface waters of the **Subject Watershed** these contaminated waters commingle with contaminated influent groundwaters to adversely impact the quality and beneficial uses of those surface waters and have contributed to and continue to contribute to significant impairments of Spruce Run and Muddlety Creek.

**45.**   By:  **(a)** the known **AMD** from unsealed fissures in the underground mine workings on the **Subject Property** wholly unaddressed by any containment, control, amelioration or remediation efforts; **(b) AMD** generated by infiltration of water through mining waste **Disposed** of by each of the Defendants within the mine works, on the surface of and from the unlined ditches within the **Subject Property** in manner that does not afford adequate protection of the **Environment**; and **(c)** the past impacts to groundwater and surface water associated with mining-impacted wastewater discharges from unsealed mine portals that occurred during each of Defendants period of operation of coal mining **Facilities** on the **Subject Property**, each of the Defendants have caused and contributed during each of their respective periods of mining

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **27** of **63** pages

operation at and immediately adjacent to the **Subject Property** to significant adverse impacts to and imminent and substantial endangerments of the groundwater and surface waters within the **Subject Watershed**. The **AMD** contaminants contained in those mining waste **Discharges** into the groundwaters has been and are continuing to be **Disposed** of without a permit and without being subject to any monitoring or control of the adverse impact of those **Discharges** on the waters of the Right Fork Spruce Creek and the surrounding **Environment**.

46.   The past **Disposal** of **AMD** contamination into the groundwater from the **unlined** ditches and the unlined surface impoundment within the **Subject Property** caused and contributed to by conduct of mining operations during the course of each Defendant's operation of coal mining **Facilities** at the **Subject Property** has resulted in, and continues to result in, substantial adverse effects on the **Environment**. These past and on-going **Discharges** from the **unlined** ditches on the **Subject Property** into the groundwater system at and underlying the **Subject Property** are: **(a) not** "industrial discharges which are point sources subject to regulation under Section 402 of the Federal Water Pollution Control" within the meaning of that phrase as used in RCRA § 1004(27), 42 U.S.C. § 6903(27); **(b)** have been since their inception and remain unpermitted; **(c)** are continuing to migrate into the waters of the Right Fork Spruce Run and through the **Environment**; and **(d)** have been and are being **Discharged** directly into groundwaters that have a direct hydraulic connection to surface waters of the Right Fork Spruce Run within the **Subject Watershed**.

47.   The unlined ditches and the original, unlined surface impoundment on the **Subject Property** are within the Right Fork Spruce Run; therefore, the groundwater in contact with those **AMD** mining waste **Discharges** from those unlined ditches and impoundment, and these **Discharges** are also directly connected to the surface water of the Right Fork Spruce Run.

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **28** of **63** pages

Unpermitted **Discharges** of **AMD** contaminants have occurred and are occurring at and from each of the Defendants' former mining **Facilities** at the **Subject Property**.

**48.**   The **AMD** that has resulted and is continuing to result from each of the Defendants' past mining operations at the **Subject Property** contains at least the following contaminants: aluminum, arsenic, cadmium, beryllium, iron, manganese, nickel, sulfate, zinc and selenium.   In addition, these various **AMD** contaminants that have been and continue to be released into the **Environment** from each of the Defendants' **Facilities** at the **Subject Property** have combined and will continue to combine within the surface soils and groundwater and in subsurface soils within the **Subject Watershed** and cause or contribute to additional adverse environmental conditions and imminent and substantial endangerments to the **Environment**, including soil, groundwater, and surface waters with the **Subject Watershed**.

**49.**   By the past and ongoing effects of infiltration of water together with exposure to the air, the mining waste that was removed from the coal seams and **Discarded** in unlined piles of mining waste material on the surface of, and within the mine works on, the **Subject Property** during the course of each of the Defendants' operation of their mining Facilities on or immediately adjacent to the **Subject Property** and within the **Subject Watershed**, whether those piles are covered with surface soils or not, has also caused and contributed to, and is continuing to cause and contribute to, the **Release** of **AMD** contaminants to groundwaters and surface waters within the **Subject Watershed**.

**50.**   Prior to the conduct of coal mining within the **Subject Watershed**, the aquifer underlying that watershed had provided a safe and reliable source of drinking and irrigation water to the residents living and working within that watershed for at least the previous 150 years.   In fact, that aquifer was the sole source of potable water for the residents of that area until approximately

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **29** of **63** pages

2010.  As a result of the extensive **AMD** contamination of that aquifer by the **Discharges** from Defendants' mining operations and other mining operations within the **Subject Watershed**, the WVDEP found it necessary and proper to expend over $1.75 million dollars from the State of West Virginia's very cash-strained "Abandoned Mined Lands" Program to bring a local municipal public drinking water supply line up into the Spruce Creek area because the aquifer in the **Subject Watershed** was no longer safe for potable or irrigation use.

c. **THE AMD CONTAMINATION RELEASED INTO THE ENVIRONMENT WITHIN THE SUBJECT WATERSHED DURING AND AFTER EACH OF THE DEFENDANTS' OPERATION OF THEIR COAL MINING FACILITIES ON THE SUBJECT PROPERTY, IS A SOLID WASTE, A HAZARDOUS WASTE AND A HAZARDOUS SUBSTANCE:**

1. _**AMD Released at and Emanating from the Subject Property is a Hazardous Substances under CERCLA**_:

51.  The federal Comprehensive Environmental Response, Compensation & Liability Act of 1980, as amended ("CERCLA" or "federal Superfund Act"), 42 U.S.C. §§ 9601-9675, provides a comprehensive mechanism and a statutory and a regulatory (*i.e.,* the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R., Part 300) framework to direct governmental entities and private parties responding to the **Release** of **Hazardous Substances** into the **Environment**, and provides guidance, procedures, cleanup criteria, and controls for such remedial activities.

52.  In  CERCLA §102(a), 42 U.S.C. § 9602(a), Congress directed the Administrator of the U.S. Environmental Protection Agency to designate "as hazardous substances . . . such elements, compounds, mixtures, solutions, and substances which, when released into the environment may present substantial danger to the public health or welfare or the  environment." 42 U.S.C. § 9602(a).  The  Administrator's resulting designations  are  set  forth  in  duly

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **30** of **63** pages

promulgated "notice and comment" regulations codified at 40 C.F.R. § 302.4.

**53.**  Arsenic, beryllium, cadmium, antimony, manganese, and selenium are each a substance listed in 40 C.F.R. § 302.4.  Consequently, each such substance is a **Hazardous Substance** as the term is defined in CERCLA § 101(14), 42 U.S.C. § 9601(14).

**54.**  In interpreting and applying the provisions of CERCLA § 102(a) and 40 C.F.R. § 302.4, Federal Courts have consistently held that where a mixture contains a designated **Hazardous Substance**, like arsenic, beryllium, cadmium, antimony, manganese, or selenium, then the entirety of that mixture is itself a **Hazardous Substance** for the purposes of CERCLA.  *See, e.g., New York* v. *Exxon Corp.,* 766 F. Supp. 177, 180 (S.D.N.Y. 1991), *State of Arizona and the City of Phoenix* v. *Motorola, Inc.,* 774 F. Supp. 566 (D. AZ, 1991), *United States* v. *Carolawn,* 1984 U.S. Dist. LEXIS 15937, 21 Env't Rep. Cases 2124, 2126 (D.S.C. 1984).  Consequently, all of the untreated and partially treated **AMD** that has been and is being **Released** into the **Environment** at and emanating from the Defendants' former mining operations within the **Subject Watershed** is a **Hazardous Substance** as that term is defined herein and in CERCLA § 101(14), 42 U.S.C. § 9601(14).

**2.  *AMD Released at and Emanating from the Subject Property is a Solid Waste and Hazardous Waste for Purposes of RCRA Subtitle G & the West Virginia Hazardous Waste Management Act:***

**55.**  The mining waste that has been **Disposed** of on the **Subject Property** and the **AMD** that has been and is continuing to be **Released** into the **Environment** from the unsealed fissures, and unsealed mine portals within the **Subject Watershed**, all of which was caused or contributed to, in whole or in substantial part, by each of the Defendants' former mining operations, is a **Discarded** solid or liquid, or both, material resulting from mining operations.  Consequently, all such mining waste and **AMD** is a **Solid Waste** as defined herein and in RCRA § 1004(27),

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.,* (S.D WV)
**Complaint**
Page **31** of **63** pages

42 U.S.C. § 6903(27), and as the same term in used in RCRA Subtitle G, specifically including RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B).  In addition, all such **AMD** is a "Waste" as that term is defined in the West Virginia Hazardous Waste Management Act, W. Va. Code § 22-18-3(16).[3]

**56.**   The untreated and partially treated **AMD** that has been and is continuing to be released into the groundwater from the unlined surface impoundments and unlined ditches on the **Subject Property**, all of which was caused or contributed to, in whole or in substantial part, by each of the Defendants' former mining operations, is:  **(a)** a discarded liquid material resulting from mining operations; and **(b)** is not "an industrial discharges which are point sources subject to permits under section 402 of the Federal Water Pollution Control Act, as amended (86 Stat. 880)," within the meaning of that phrase as set forth in RCRA § 1004(27), 42 U.S.C. § 6903(27), a provision of RCRA Subtitle A, and in the West Virginia Hazardous Waste Management Act, W. Va. Code § 22-18-3(16).  Consequently, all such **AMD** is a **Solid Waste** as defined herein and in RCRA  1004(27), 42 U.S.C. § 6903(27), and as the same term in used in RCRA Subtitle G, specifically including RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B).  In addition, all such **AMD** is a "Waste" as that term is defined and used in the West Virginia Hazardous Waste Management Act, W. Va. Code, Chapter 22, Article 18.

**57.**   Although the full nature and extent of the harms to and existing and threatened endangerments to health and the **Environment** within the **Subject Watershed** resulting from the

---

[3]  As applies only to the federal Hazardous Waste regulatory program under RCRA Subtitle C, in exercise of his authority under RCRA §3006, 42 U.S.C. § 6926, the Administrator of USEPA has authorized the State of West Virginia to operate within the State of West Virginia its Hazardous Waste Management Program "in lieu of the federal [RCRA Subtitle C] program."  *See* 51 Fed. Reg. 17739B (May 15, 1986); 65 Fed. Reg. 29973 (May 10, 2000); 78 Fed. Reg. 70225 (November 25, 2013).  Such authorization reflects USEPA's determination that the West Virginia Hazardous Waste Management law and regulations are, as they are required to be by RCRA § 3006, "consistent with the federal [RCRA] Subtitle C hazardous waste regulatory program."

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page 32 of 63 pages

past and ongoing **Discharge** of **AMD** into that Watershed is not, and cannot properly be, entirely

known until completion of a Remedial Investigation ("**RI**") described in **NCP** Section 300.430,

40 C.F.R. § 300.430, (which **RI** must include as appropriate all necessary fact-gathering and

analysis regarding all of the endangerments to health and the **Environment** that may be presented

by the **Released Hazardous Substances**), the following are some of the known potential harmful

effects of the contaminants of concern contained in the past and ongoing **AMD** Discharges from

the Defendants' mining **Facilities** into the **Subject Watershed**:

(a) **Iron:**   The impairments to surface water from mining activities documented in the

**Subject Watershed** by the West Virginia Department of Environmental Protection

("WVDEP") in the course of its investigations and monitoring with respect to the § 303 List

of Impaired Waters relate to the numeric water quality criteria for total iron.   These

impairments are related to protection of both human health and aquatic life.   Precipitation of

ferric hydroxide may result in a complete blanketing of the stream bottom, adversely affecting

both macro invertebrates and fish.   Because the gill surface of the fish tends to be alkaline,

soluble ferrous iron can be oxidized to insoluble ferric compounds which then cover the gill

lamellae and inhibit respiration.   At a low water temperature and in the presence of iron, iron-

depositing bacteria will multiply rapidly on the gills and further contribute to the oxidation of

ferrous iron compounds.   Their filamentous colonies cover the gills.   The precipitated iron

compounds and tufts of the iron bacteria reduce the gill area available for respiration, damage

the respiratory epithelium, and may thus suffocate the fish.   In a similar toxic action, iron

compounds can precipitate on the surface of fish eggs which then die due to a lack of oxygen.

(b) **Manganese:**   Manganese is another metal that is widely distributed in mine drainage and

is contained in the past and ongoing AMD **Discharges** into the **Subject Watershed** from the

Defendants' mining operations.  It can be present in a variety of forms and compounds and complexes with organic compounds.  Manganese is persistent and can be carried for long distances downstream of a source of mine drainage.  Manganese precipitates along with siltation significantly lowering macroinvertebrate species diversity and changing healthy stream community structure.  Manganese is an essential trace element in humans that can elicit a variety of serious toxic responses upon prolonged exposure to elevated concentrations either orally or by inhalation.  The central nervous system is the primary target.  Because of the greater bioavailability of manganese from water, a chronic and sub-chronic Reference Dose ("RID") for drinking water of 0.005 mg/kg/day has been calculated by USEPA.

**(c) pH:**  Aquatic life is adapted to the natural pH levels in their bodies of water, and even slight changes in pH can have negative impacts on the health of the aquatic community. Moderate changes in pH can affect fish egg production, fish and insect gills, and amphibian populations. A change in the pH of water can alter the behavior of other chemicals in the water, and many heavy metals dissolve in acidic water.  Most freshwater streams have a natural pH in the range of 6 to 8.  Acid deposition has many harmful ecological effects when the pH of most aquatic systems falls below 6 and especially below 5.

**(d) Aluminum:**  Some of the impairments to the surface waters of the **Subject Watershed** from mining activities documented by WVDEP in its report entitled *2008 Total Maximum Daily Loads for Streams in the Gauley River Watershed, West Virginia* are related to numeric water quality criteria for aluminum.  These impairments are related to protection of aquatic life.  Of the three major metals present in mine drainage, aluminum has the most severe adverse effects on stream aquatic life.  Elevated levels of aluminum can affect some species' ability to regulate ions, like salts, and inhibit respiratory functions, like breathing.  Aluminum

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **34** of **63** pages

can accumulate on the surface of a fish's gill, leading to respiratory dysfunction, and possibly death.  Aluminum rarely occurs naturally in water at detectable concentrations; however, higher concentrations can occur as a result of drainage from coal mining, and in fact do occur in the surface waters of the **Subject Watershed**.  The finding of a significant positive relationship between drinking water aluminum levels and the development of Alzheimer's disease in a recent large prospective study, together with the finding of a positive relationship in a number of less methodologically sound studies, suggests that the association between aluminum and Alzheimer's disease should be further investigated.

**(e) Sulfate:**  Sulfate is an indicator of mining impacts to surface waters.  USGS reports background concentrations in WV streams to be less than 25 mg/L.  Streams in the Subject Watershed are much higher, and data indicates sulfate concentrations exceed the level WVDEP considers a likely stressor to aquatic life.

**(f)  Arsenic:**  Arsenic has been linked to a number of different cancers.  These include cancer of the bladder, lungs, skin, kidney, nasal passages, liver, and prostate.  USEPA set and currently maintains the arsenic standard for drinking water at 10 ppb (or 0.010 parts per million).  Arsenic is a teratogen[4] and carcinogen that can traverse placental barriers and produce fetal death and malformations in many species of mammals.  Many species of freshwater biota are adversely affected by high concentrations of arsenic or various organ arsenicals.  These adverse effects include death and malformations of toad embryos, growth inhibition of algae, mortality of amphipods and gastropods, and behavioral impairment of

---

[4] The MedicineNet website provides the following definition: "Teratogen: Any agent that can disturb the development of an embryo or fetus.  Teratogens may cause a birth defect in the child.  Or a teratogen may halt the pregnancy outright.  The classes of teratogens include radiation, maternal infections, **chemicals**, and drugs.  https://www.medicinenet.com/script/main/art.asp?articlekey=11315 [Bolding emphasis added]

goldfish.

**(g) Cadmium:**  Cadmium has been detected in water in the **Subject Watershed**.  USEPA finds that cadmium is highly persistent in water, has a high potential for bioaccumulation in fish and other aquatic organisms, and is persistent in many tissues, including muscle, liver and kidney.  In humans, long term exposure may result in damage to blood, bones, kidneys and liver.  Cadmium effects on aquatic organisms are analogous to those in humans and include skeletal deformities and impaired functioning of kidneys in fish.

**(h) Selenium:**  Selenium has been found in surface water in the **Subject Watershed**. Selenium bioaccumulates in the aquatic food chain and chronic exposure in fish and aquatic invertebrates can cause reproductive impairments (e.g., larval deformity or mo1tality). Selenium can also adversely affect juvenile growth and mortality.  Selenium is also toxic to waterfowl and other birds that consume aquatic organisms containing excessive levels of selenium.  Selenium is toxic to humans at high concentrations, with symptoms of selenium poisoning including gastrointestinal disturbances, discoloration of the skin and decayed teeth.

**(i) Beryllium:**  The available data for beryllium indicate that acute and chronic toxicity to freshwater aquatic life occur at concentrations as low as 130 and 5.3 ug/1, respectively, and would occur at lower concentrations among species that are more sensitive than those tested. Hardness has a substantial effect on acute toxicity.

**(j) Nickel:**  Nickel is listed by USEPA as one of 129 priority pollutants.  Study results indicate that nickel is a developmental toxicant in animals.  Several physio-chemical factors of water are known that modify nickel toxicity to fish.  Acute lethality of nickel increases with decreasing water pH.

**58.**  Because of its quantity, concentration, physical and chemical characteristics, all of the

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **36** of **63** pages

mining waste that has been **Disposed** of on the **Subject Property** and all of the **AMD** that has been **Discharged** into the **Environment** from each of the Defendants' mining **Facilities** on the **Subject Property** during the time periods that each of the Defendants was operating coal mining Facilities at the Subject Property, and all of the **AMD** that has been and is being **Discharged** into the **Environment** at the **Subject Property** or at and emanating from the Defendants' former mining operations within the **Subject Watershed** after each of the Defendants' respective periods of operation at the **Subject Property** is a **Solid Waste** and a "Waste" (as that term is defined in the West Virginia Hazardous Waste Management Act) that "may pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed" within the meaning of that phrase as set forth in both RCRA § 1004(5), 42 U.S.C. § 6903(5), and in the West Virginia Hazardous Waste Management Act, W. Va. Code § § 22-18-3(6).  Consequently, all such **AMD** is a **Hazardous Waste** as that term is defined in RCRA § 1004(5), 42 U.S.C. § 6903(5), and as the same term in used in RCRA Subtitle G, specifically including RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), and in the West Virginia Hazardous Waste Management Act, W. Va. Code § 22-18-3(6).

    **d.** **THE PAST, CURRENTLY ON-GOING AND THREATENED FUTURE RELEASES OF AMD CONTAMINATION INTO THE ENVIRONMENT RESULTING FROM EACH OF DEFENDANTS' PAST MINING OPERATIONS HAVE COMMINGLED OR WILL COMMINGLE WITHIN THE ENVIRONMENT TO CAUSE AND CONTRIBUTE TO A SINGLE, INDIVISIBLE HARM TO THE PUBLIC HEALTH, SAFETY, WELFARE AND THE ENVIRONMENT AND AN ACTUAL AND POTENTIAL ENDANGERMENT TO HEALTH AND THE ENVIRONMENT AT, ON AND UNDER THE SUBJECT PROPERTY AND WITHIN THE SUBJECT WATERSHED, WHICH HARM IS NOT REASONABLY CAPABLE OF BEING RELIABLY APPORTIONED TO THE ACTS OR OMMISSIONS OF ANY INDIVIDUAL DEFENDANT.**

    59.   The **AMD** contaminant generation from each of the Defendants' former mining **Facilities** in the **Subject Watershed** occurs in and from both the mined seams and in the unlined mine waste

handling **Facilities** within the **Subject Property** (*i.e.,* the unlined mining waste piles on the surface and within the mine works, the unlined ditches and the unlined surface impoundment on the **Subject Property**). Seepage of **AMD** contaminants from each of the Defendants' former mining **Facilities** in the **Subject Watershed** and the resulting **AMD** contaminated groundwater has flowed and continues to flow into surface waters within the **Subject Watershed.** These past and ongoing **Discharges** commingle within the **Environment** with similarly contaminated groundwater from other mining operations in the adjacent (Spruce Run) valley aquifer and surface streams, forming a single surface water and groundwater plume of toxic contamination and similar sediment plume.

60. **AMD** and mining waste **Discharges** that have resulted and are continuing to result from: **(a)** each of the Defendants' past mining operation within the **Subject Watershed;** and **(b)** the abandoned mines and past mining operations of their respective predecessor and successor mining operators within the **Subject Watershed** have caused or contributed to, and continue to cause and contribute to, impairments to the quality and beneficial uses of the waters of the **Subject Watershed**, and have commingled within the groundwater, surface water system, and sediments of Right Fork Spruce Run. As a result of this commingling, this **AMD**-contaminated surface water and groundwater and sediments form a commingled, single plume within the soils, subsurface soils, groundwater and surface water from the Right Fork Spruce Run to the main stem of Spruce Run, which is a tributary of Brushy Fork and the related sediments within the Spruce Run Watershed. This commingled, single plume of toxic contaminants has caused or contributed to, and is causing and contributing to, the existing and imminently threatened future impairments of the quality and beneficial uses of the waters within Spruce Run, Brushy Fork, and Muddlety Creek; each "navigable waters," and each a WV 303d listed or TMDL impaired streams.

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **38** of **63** pages

**61.** The **Solid Wastes**, **Hazardous Wastes**, **Hazardous Substances**, and **Pollutants and Contaminants** that have been and are continuing to be **Released** into the **Environment** within the **Subject Watershed** as a result of the **AMD** and mine waste **Discharges** from each of the Defendants' mining operations are easily absorbed by fish and other aquatic organisms.  Even small concentrations of these **Solid Wastes**, **Hazardous Wastes** and **Hazardous Substances** can be toxic because some of those toxic contaminants bioconcentrate or bioaccumulate.  Toxicity of those **Solid Wastes**, **Hazardous Wastes** and **Hazardous Substances** also produces adverse biological effects on an organism's survival, activity, growth, metabolism, or reproduction.  These toxic contaminants can be lethal or harm the organism without killing it directly.  Cumulative, adverse effects on an organism's activity, growth, metabolism, and reproduction are examples of these sublethal effects.  Some of the contaminants of concern are also bioaccumulated within the plants and animals that are in direct or indirect contact with the food chain and adversely impact the health of these organisms and organisms that feed upon those organisms.

**62.** The cumulative adverse impacts on the **Environment** that have resulted and are continuing to result from the commingled, single plume of toxic contaminants that has and is continuing to be **Discharged** as a result of mining operations of the Defendants within the **Subject Watershed** include loss and continued degradation of biodiversity in the receiving stream, and bioaccumulation within the plants and animals within the **Subject Watershed** that are in direct or indirect contact with the food chain and adversely impact the health of these organisms and the organisms that feed upon those organisms.

**63.** Once a receiving water or organism has been harmed or is imminently threatened with harm by this commingled, single plume of toxic contaminants that has and is continuing to be **Discharged** as a result of combined mining operations of the Defendants within the **Subject**

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **39** of **63** pages

**Watershed,** there exists no reasonable or reliable basis in fact or science for apportioning that harm or threatened harm to health and the **Environment** to any of the Defendants.

**64.**  As a consequence of the foregoing, each of the Defendants, whether acting alone or in concert with other parties, have, by the conduct of their respective mining operations within the **Subject Watershed** caused and contributed to a single, indivisible harm to health and the **Environment** at and emanating from the **Subject Property** and within the **Subject Watershed**, which harm is not reasonably capable of being reliably apportioned to the acts or omissions of any individual defendant or subset of Defendants.

<u>**COUNT ONE**</u>

**RECOVERY OF RESPONSE COSTS AND
DECLARATORY RELIEF PURSUANT TO CERCLA
(42 U.S.C. §§ 9607(a) and 9613(g))**

***(By Plaintiff Living Lands, LLC against all Defendants)***

**65.**  Plaintiff **L4C** incorporates and realleges in this Count the allegations asserted in the foregoing paragraphs as if fully set forth herein.

**66.**  The mines and related structures at, on and under the **Subject Property** formerly operated by each of the Defendants within the **Subject Watershed** are each an installation, site, or area at which one or more **Hazardous Substances**, specifically including mining waste and **AMD** emanating from the mining **Facilities**, groundwater seeps, unsealed mine portals, unlined surface mining waste impoundment, and from the unlined surface ditches (as respect the past and ongoing **Discharges** from those ditches and impoundment into the groundwater) on the **Subject Property**, have been deposited, **Disposed** of, placed, or otherwise came to be located.  Accordingly, each of the Defendants' mining locations and operations at, on and under the **Subject Property** and within the **Subject Watershed** are each a "**Facility**" within the meaning of CERCLA § 101(9),

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **40** of **63** pages

42 U.S.C. § 9601(9).

67.  As a direct result of each of the Defendants' coal mining operations at, on and under the **Subject Property**, **Hazardous Substances** were **Disposed** of at and from the **Subject Property** and within the **Subject Watershed** during the respective periods of time that each of the Defendants operated **Facilities** at the **Subject Property**.  Accordingly, each of the Defendants are operators of one or more coal mining **Facility(ies)** at, on and under the **Subject Property** at the time of **Disposal** of **Hazardous Substances** at and from each such **Facility**.

68.  The **Hazardous Substances** which were **Released** into the **Environment** during and as direct result of each of the Defendants' operation of mining **Facilities** at, on and under the **Subject Property** have migrated into and through environmental media in the **Subject Watershed** and have become located at and within the surface soils, subsurface soils and groundwater underlying the **Subject Property** and within the surface waters and groundwaters of the **Subject Watershed.**

69.  As a consequence of the foregoing **Release** of **Hazardous Substances** and **Disposal** of **Solid Wastes** and **Hazardous Wastes** at and emanating from the **Subject Property** and the **Release** of such substances and such wastes into the **Environment**, Plaintiff **L4C** incurred necessary costs of **Response** during May 2018, in a manner consistent with the National Oil and Hazardous Substance Pollution Contingency Plan ("**National Contingency Plan**" or "**NCP**"), 40 C.F.R., Part 300[5].  Such costs of **Response** included costs associated with **Plaintiff L4C's** limited environmental investigation of the **Subject Property** described above.

70.  The **Release** from each of the Defendants' coal mining **Facilities** and operations at, on

---

[5]  As is expressly stated in the **NCP**:  "The purpose of the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) is to provide the organizational structure and **procedures for preparing for and responding to discharges of oil and releases of hazardous substances, pollutants, and contaminants**."  40 C.F.R. § 300.1  [Bolding emphasis added].

and under the **Subject Property**, and the threatened future **Releases** of Hazardous Substances as a direct consequence of each Defendants' past conduct of coal mining operations at, on and under the **Subject Property** have each caused or contributed to, and are continuing to cause and contribute to, a single, indivisible harm to:  **(a)** health, the **Environment** within the **Subject Watershed;** and **(b)** to the reasonable, comfortable use and enjoyment by each of the Plaintiffs' of the **Subject Property** for which no reasonable basis for apportioning such harm among the individual defendants exist.  Accordingly, each of the Defendants are jointly and severally liable to Plaintiff **L4C** for all costs of **Response** to the **Released Hazardous Substances** within the **Subject Watershed** and to the  resulting actual and threatened endangerments to the public health, safety, welfare or the **Environment** incurred and to be incurred by Plaintiff **L4C** consistent with the **NCP**.

**71.**  Pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), Plaintiff **L4C** is entitled: to a lump sum judgment, jointly and severally, against Defendants Jack Cline, Robert Lee Cline, Brady Cline Coal Co. and B. & S. Contracting, Inc. for the total amount of its costs of **Response** to the **Released Hazardous Substances** within the **Subject Watershed** incurred consistent with the **NCP** to the date of such judgment, together with prejudgment interest at the rate authorized in CERCLA § 107(a).

**72.**  Pursuant to CERCLA § 113(g), 42 U.S.C. § 9613(g), Plaintiff **L4C** is entitled to a declaratory judgment that Defendants Jack Cline, Robert Lee Cline, Brady Cline Coal Co. and B. & S. Contracting, Inc, are liable, jointly and severally, for all necessary **Response** costs to be incurred by **Plaintiff L4C** in responding to the endangerments and threatened endangerments to the public health, safety, welfare and the **Environment** that may be caused or contributed to by the **Hazardous Substances Released** from each of the Defendants' mining operations and

**Facilities** within the **Subject Watershed** consistent with the **National Contingency Plan**, which declaratory judgment will be binding on any subsequent action or actions to recover further **Response** costs.

### COUNT TWO:

**PURSUANT TO RCRA § 7002(a)(1)(B), JUDICIAL ABATEMENT OF CONDITIONS RESULTING FROM EACH OF THE DEFENDANTS' PAST HANDLING AND DISPOSAL AT, ON AND UNDER THE SUBJECT PROPERTY AND WITHIN THE SUBJECT WATERSHED OF SOLID WASTES OR HAZARDOUS WASTES, OR BOTH, WHICH MAY PRESENT AN IMMINENT & SUBSTANTIAL ENDANGERMENT TO HEALTH OR THE ENVIRONMENT**

*(Asserted by Plaintiff Living Lands, LLC Against All Defendants)*

**73.** Plaintiff **L4C** incorporates and realleges in this Count the allegations asserted in the foregoing paragraphs of this Complaint as if fully set forth herein.

**74.** Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B) under which Plaintiff **L4C** bring this count, is part of Subtitle G of RCRA, and one of RCRA's citizen enforcement provisions. Section 7002(a)(1)(B) authorizes "any person" (*i.e.,* a phrase uniformly interpreted by the Federal Courts to be constitutionally restricted to, and to mean only, any person with standing under Article III of the U.S. Constitution[6]) to seek redress in federal court in the form of judicial abatement of any potential imminent and substantial endangerments that may be posed to public health or the **Environment** by, *inter alia,* the past or present handling or **Disposal** of **Hazardous Waste**, **Solid Waste**, or both. The gravamen of a Section 7002(a)(1)(B) claim is the current existence of a potential imminent and substantial endangerment to health **or** the environment, rather than a violation of any statute or regulation.

---

[6] *See*: *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130 (1992)

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page 43 of 63 pages

75.  Any "person"[7] may bring a lawsuit under RCRA § 7002(a)(1)(B) when:  **(a)** a "solid or hazardous waste;" **(b)** "may present an imminent and substantial endangerment to health or the environment;" and **(c)** the defendant falls within one of the categories of "persons" that Congress declared liable for taking abatement action or "such other action as [this Court determines] may be necessary."

76.  The persons declared strictly liable by Congress for abatement of the potential endangerments to health or the environment addressed by RCRA § 7002(a)(1)(B) are "persons" that "contributed to the past or present handling, storage, treatment, transportation, or disposal" of the **Hazardous Wastes** or **Solid Wastes** that may present the imminent and substantial endangerment at issue.  Pursuant to the express terms of RCRA § 7002(a)(1)(B),  this category of liable "persons" specifically include: "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility" whose past or present actions have contributed or are contributing to the imminent and substantial endangerment to health **or** the **Environment**.

77.  Plaintiff **L4C**  and each of the Defendants are  a "person"  within  the meaning of RCRA § 1004(15), 42 U.S.C. § 6903(15).

78.  Each of the Defendants is a "person," that by his or its past operation of coal mining **Facilities** at the **Subject Property** has contributed to the past handling and **Disposal** of **Solid Wastes** and **Hazardous Wastes** at the **Subject Property** and within the **Subject Watershed**, which handling and **Disposal** has caused, contributed to, and is continuing to contribute to

---

[7] RCRA § 1004(15), 42 U.S.C. § 6903(15), provides:

> The term "person" means an individual, trust, firm, joint stock company, corporation (including a government corporation), partnership, association, State, municipality, commission, political subdivision of a State, or any interstate body and shall include each department, agency, and instrumentality of the United States.

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **44** of **63** pages

conditions at and emanating from the **Subject Property** and within the **Subject Watershed** that may present an imminent and substantial endangerment to health or the **Environment**.

**79.**  In compliance with the requirements of RCRA § 7002(b)(2), Plaintiff **L4C** has provided by United States Postal Service Registered Mail each Defendant with a "notice of endangerment" at issue herein; a copy of which notice is attached hereto as **Exhibit 2** and incorporated herein by reference.  Such "notice of endangerment" was received by each Defendant at least ninety (90) days prior to the commencement of this action.

**80.**  The Federal Courts, in analyzing and applying the phrase "the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment" within RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), have given the language of this remedial statute an expansive interpretation[8]:

**(a)**  ***"may present"***[9]:  First, Federal Courts have consistently noted that the language of RCRA § 7002(a)(1)(B) includes the word "may" before the standard of liability.[10]  As held in a seminal decision of a United States District Court in California:  "[t]his is expansive language, which is intended to confer upon the courts the authority to grant affirmative

---

[8]  *Liebhart* v. *SPX Corp.*, 917 F.3d 952 (7th Cir. WI 2019); *Goldfarb* v. *Mayor & City Council of Balt.*, 791 F.3d 500 (4th Cir. MD 2015); *Me. People's All.* v. *Mallinckrodt, Inc.*, 471 F.3d 277 (1st Cir. ME 2006); *Interfaith Cmty. Org.* v. *Honeywell Int'l, Inc.*, 399 F.3d 248 (3d Cir. NJ 2005); *United States* v. *Waste Indus., Inc.*, 734 F.2d 159, 165 (4th Cir. 1984) (rejecting the argument that "[§ 6972] was designed to control pollution only in emergency situations"); *Voggenthaler* v. *Md. Square, LLC*, 2010 U.S. Dist. LEXIS 74217 (D. Nev. 2010); *Lincoln Props. v. Higgins*, 1993 U.S. Dist. LEXIS 1251 (E.D. Cal. 1993) (Levi, J.).

[9]  Notably, Congress amended the language of RCRA § 7002(a)(1)(B) in 1980 by substituting the phrase "may present" for the original 1976 wording "is presenting."  *Me. People's All., supra* at 287 (citing *Solid Waste Disposal Act of 1980*, *Pub. L. 96-482, § 25, 94 Stat. 2334, 2348*).

[10]  *Lincoln Properties, supra,*1993 WL 217429 * 13.

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page 45 of 63 pages

equitable relief to the extent necessary to eliminate any risk posed by toxic wastes."[11]  To the same effect, in the first major case interpreting RCRA § 7002(a)(1)(B) the Third Circuit emphasized that the statute "enhanced the courts' traditional equitable powers by authorizing the issuance of injunctions when there is but a risk of harm, a more lenient standard than the traditional requirement of threatened irreparable harm."[12]     Accordingly, a RCRA § 7002(a)(1)(B) plaintiff, like Plaintiff **L4C** herein, "need only demonstrate a potential risk of harm."[13]

**(b)** _**"endangerment"**_:  Second, the term "endangerment" has been consistently interpreted by the Federal Courts to mean "a threatened or potential harm and does not require proof of actual harm."[14].

**(c)** _**"imminent"**_:  Third, the vast majority of Federal Courts have endorsed the principle that "a finding of 'imminence' does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present."[15]  To the same effect:  "An endangerment is 'imminent' if the factors giving rise to it are present, even though the harm may not be realized for years."[16]

**(d)** _**"substantial"**_:  Fourth and notably, the majority of Federal Courts have consistently held

---

[11]  **Id** (internal quotations [*37] and citations omitted).

[12]  _United States v. Price_, 688 F.2d 204, 211 (3d Cir. NJ 1982)

[13]  _Liebhart_, supra; _Goldfarb, supra; Fairway Shoppes Joint Venture_ v. _Dryclean U.S.A._, 1996 U.S. Dist. LEXIS 22364, (S.D. Fla. 1996)

[14]  _Lincoln Properties, supra,_ 1993 U.S. Dist. LEXIS 1251, 1993 WL 217429 at *12 (a) ("When one is endangered, harm is threatened; no actual injury need ever occur." (quoting _Ethyl Corp._ v. _Envtl. Prot. Agency_, 541 F.2d 1, 13 (D.C. Cir. 1976)).

[15]  **Id**; _see also, Liebhart_, supra; _Goldfarb, supra; United States v. Waste Indus., Inc., supra; Voggenthaler_, supra.

[16]  _Lincoln Properties, supra._

_LIVING LANDS, LLC, et al._ v. _JACK CLINE, et al._, (S.D WV)
**Complaint**
Page **46** of **63** pages

that "the word 'substantial' within RCRA § 7002(a)(1)(B) does not require quantification of the endangerment (*e.g.*, proof that a certain number of persons will be exposed, that 'excess deaths' will occur, or that a water supply will be contaminated to a specific degree.")[17]. Instead, the "decisional precedent demonstrates that an endangerment is substantial if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm by release or a threatened release of a hazardous substance if remedial action is not taken."[18]

(e)   *"health or the environment"*:  Every Federal Court that has addressed the meaning of this phrase in the statute[19] has held to the effect that RCRA § 7002(a)(1)(B):

> speaks of endangerment to health or the environment.  The term "environment" appears to include air, soil and water. *See:*  [*Ethyl Corp.* v. *EPA*, 176 U.S. App. D.C. 373, 541 F.2d 1 (1976)]; see also 42 U.S.C. § 9601(8) (CERCLA definition of "environment" includes water, land and air).  **Neither the statute nor the caselaw interposes an additional requirement that humans or other life forms be threatened.**

*Lincoln Props.* v. *Higgins*, 1993 U.S. Dist. LEXIS 1251, *47 (E.D. Cal. 1993) (Levi, J.) [Bolding emphasis added]

81.   Although the vast majority of Federal Courts have consistently held that in order to give effect to its remedial purposes RCRA § 7002(A)(1)(b) should be given an expansive reading, when determining whether there is a risk of imminent and substantial endangerment, it is also well recognized by the Federal Courts that "injunctive relief should not be granted 'where the risk of

---

[17]  **Id** at p. 13; *See also, Liebhart, supra* ("[T]here is no requirement in *RCRA* for a plaintiff to make "a particular quantitative showing as a *sine qua non* for liability." citing *Interfaith, 399 F.3d at 260* and *Dague, 935 F.2d at 1356)*; *Goldfarb, supra; United States v. Waste Indus., Inc.; Voggenthaler*, *supra*.

[18]  *Lincoln Properties, supra; See also:  Liebhart*, *supra*; *Goldfarb, supra; United States v. Waste Indus., Inc., supra; Voggenthaler*, *supra*.

[19]  *Interfaith Cmty. Org.* v. *Honeywell Int'l, Inc.*, 399 F.3d 248 (3d Cir. NJ 2005), cert. denied, *545 U.S. 1129, (2005)*

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page 47 of 63 pages

harm is remote in time, completely speculative in nature, or *de minimis* in degree."[20]

82.   The harms and endangerments to health and the **Environment** at the **Subject Property** and within the **Subject Watershed** caused or contributed to by each of the Defendant's past handling and disposal of **Solid Waste** and **Hazardous Waste** at and from each of their mining **Facilities** at and immediately adjacent to the **Subject Property** alleged herein are **not:  (a)** remote in time, as they have been occurring for decades and are continuing to occur within the **Subject Watershed** to date,  **(b)** speculative, in that they have already rendered the surface waters within the **Subject Watershed** as "Impaired" for purposes of the federal and State water pollution control acts and are continuing to adversely impact the quality and beneficial uses of those same waters; and **(c)** *de minimis*, in either degree or threatened longevity in the absence of urgently required abatement as evidenced by the pernicious impact of the toxic contaminants at issue over the course of the last three (3) decades on the "Waters of the State" within the **Subject Watershed**; a serious adverse impact to the **Environment** that is continuing to this very day.

83.   Each of the Defendants by their past handling and **Disposal** of both **Solid Wastes** and **Hazardous Wastes** at and emanating from the **Subject Property** during the periods of time each operated mining **Facilities** on that property, as described herein, and most particularly in Section **IV(b)** of this Complaint, have caused or contributed to, and by the ongoing effects of their past handling and **Disposal** of both **Solid Wastes** and **Hazardous Wastes** at and emanating from the **Subject Property** continue to cause and contribute to, a condition within the **Subject Watershed** that:  **(a)** has already produced actual harm to the **Environment** in the form of significant impairments to the quality and beneficial uses of surface and groundwaters

---

[20] *Lincoln Properties, supra* (quoting *United States* v. *Reilly Tar & Chem. Corp.*, 546 F. Supp. 1100, 1109 (D. Minn. 1982)).

within the **Subject Watershed**; (**b**) which may, and which Plaintiff **L4C** asserts demonstrably does, present a serious, substantial and very imminent, in fact, ongoing, endangerment to health or the **Environment** within the **Subject Watershed**; and (**c**) which may present a serious, substantial and imminent endangerment to health or the **Environment** within the already WV § 303 Listed Impaired Watershed of Spruce Run, Brushy Fork, and Muddlety Creek within this judicial district.

**84.**  Pursuant to RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), Plaintiff **L4C** is entitled to an Order of this Court requiring each of the Defendants, jointly and severally, and subject to appropriate oversight and monitoring by Plaintiff:  (**a**) to undertake at their sole cost a Remedial Investigation and Feasibility Study ("**RI/FS**") of the **Subject Watershed** in full compliance with the applicable requirements of the **NCP**, (**b**) timely and competently to implement at their sole cost such immediate or interim removal or remedial actions as the Court may determine to be necessary and proper to appropriate abatement of any public nuisance condition(s) or imminent and substantial endangerments to health or the **Environment** within the **Subject Watershed**; (**c**) following filing of the required final RI/FS report with this Court, and after conduct of such hearings as the Court determines to be appropriate, to timely and competently implement at their sole cost the Remedial Action Plan, if any, for the **Subject Watershed** selected and approved by the Court; and (**d**) pursuant to Federal Rule of Civil Procedure 53 and in furtherance of the goals of timely and effective implementation of the complex and continuing mandatory injunctive relief required herein as set forth in this Court's holding in *Ohio Valley Envtl. Coal.* v. *Fola Coal Co., LLC*, Case No. 2:15-cv-01371 (S.D. WV) (Chamber, C.J.) (September 27, 2017 Order on Plaintiff's Motion for Appointment of a Special Master), to an Order of Reference to a Special Master appointed by this Court and authorized:  (**i**) to see to the timely and effective

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **49** of **63** pages

implementation of this Court's Orders; **(ii)** to adjudicate in the first instance disputes between the parties regarding any of this Court's Orders and any requests for contempt sanctions, and to make a Report to the Court reflecting the Special Master's Findings of Fact, Conclusions of Law and Recommended Order; and **(e)** to an award of Plaintiff **L4C's** costs of this litigation (including reasonable attorney and expert witness fees and expenses).

## COUNT THREE:

### JUDICIAL ABATEMENT OF A *PER SE* PUBLIC NUISANCE DECLARED BY THE GENERAL LAW OF WEST VIRGINIA
### (*Both Plaintiffs against all Defendants*)

**85.**  Plaintiffs **L4C** and D. C. Chapman Ventures, Inc. incorporate and reallege in this Count all of allegations asserted in the foregoing paragraphs as if fully set forth herein.

**86.**  The West Virginia Supreme Court of Appeals has recognized that inherent in the "police powers" of a sovereign state at common law is the power to declare by General Law those acts, omissions and conditions that present unacceptable risks to the public health, safety, welfare or the **Environment** to be a Public Nuisance, and to prohibit and require appropriate abatement of the same. *State ex rel. Dyer* v. *Sims*, 134 W Va. 278 (1950).

**87.**  The United States Supreme Court has recognized the fundamental and essential nature of the "police powers" of a state to afford adequate protection of the public health, safety and welfare:

> **Although the police power of a state cannot be arbitrarily exercised, it is to be remembered that it is one of the most essential powers of government, <u>one that is the least limitable</u>.**  It may, indeed, seem harsh in its exercise, and usually is harsh on some individual.  **But the imperative necessity for its existence precludes any limitation upon it when not exerted arbitrarily.**

*Hadacheck* v. *Sebastian,* 239 U.S. 394, Syllabus # 1 (1915) (Bolding and Underlining emphasis added).

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **50** of **63** pages

88.   Under West Virginia law, when an act, omission or condition is declared to be a danger to the public health, safety or welfare (*i.e.,* a Public Nuisance) by provision of a General Law of the State, unless a court determines that such General Law was enacted arbitrarily or in violation of an express constitutional provision, it is the responsibility of the court to:  **(a)** determine if the act, omission or condition at issue is, in fact, governed by the language of the declaration contained in the General Law provision; and, **(b)** if the act, omission or condition is within the ambit of what has been declared to be a danger to the public by the General Law, to order the appropriate abatement of the Public Nuisance act or condition so as fully to effect the remedial purposes of the General Law provision.  *Sharron Steel Corp.* v *City of Fairmont*, 175 W. Va. 479 at 488-489 (1985); *State* v. *Wender,* 149 W. Va. 413 (1965), *overruled on other grounds, Hartsock-Flesher Candy Co.* v. *Wheeling Wholesale Grocery Co., 174 W. Va. 538* (1984)*.*

89.   In relevant part, the West Virginia Abandoned Mine Lands Act, a General Law of the State of West Virginia, flatly and unconditionally declares both that:  **(a)** voids, open and abandoned tunnels, shafts and entryways and subsidence resulting from any previous coal surface-mining operation are a hazard to the public welfare and safety; and **(b)** surface impacts of any underground or surface-mining operation may degrade the environment:

>   **The Legislature declares that voids, open and abandoned tunnels, shafts and entryways and subsidence resulting from any previous coal surface-mining operation are a hazard to the public welfare and safety** and that surface impacts of any underground or surface-mining operation may degrade the environment.

W. Va. Code § 22-2-8(a) (Bolding emphasis added.)

90.   Each of the Defendants, by their conduct of mining operations at, on and under the **Subject Property** without implementation of appropriate control and mitigation measures that afford adequate protection of the public safety and of the **Environment** have caused or contributed

*Living Lands, LLC, et al.* v. *Jack Cline, et al.*, (S.D WV)
**Complaint**
Page **51** of **63** pages

to currently existing:  **(a)** voids; and **(b)** open and abandoned tunnels and shafts at the **Subject Property**.

91.  The existing voids, and open and abandoned tunnels and shafts at the **Subject Property** present conditions that are in and of themselves hazardous to public safety, and that will remain so until those conditions are properly abated.

92.  The existing voids, open and abandoned tunnels and shafts at the **Subject Property** have been continually since the time of their creation and remain to date a source of **AMD** at, on and under the **Subject Property** and within the **Subject Watershed**, much of which is continuing to be **Discharged** into the surface and groundwaters within the **Subject Watershed** without implementation of any appropriate control or mitigation measures.

93.  Accordingly, the existing voids, open and abandoned tunnels and shafts at the **Subject Property** are each a *Per Se* Public Nuisance under West Virginia law (*i.e.,* W.Va. Code § 22-2-8(a)), and each of the Defendants is jointly and severally liable for the appropriate abatement of all the resulting Public Nuisance conditions with the **Subject Watershed**.

94.  In articulating the common law of West Virginia, the West Virginia Supreme Court of Appeals has stated:  "A public nuisance action usually seeks to have some harm which affects the public health and safety abated.  Thus, until such harm is abated, the public nuisance is continuing and the statute of limitations does not accrue."  *State, ex rel. Smith* v. *Kermit Lumber & Pressure Treating Co.*, *supra* at p. 245 (1997).

95.  Because the common law cause of action for Public Nuisance Abatement under West Virginia law is not a tort (*i.e.,* a private civil wrong for which the common law affords a remedy), but rather an exercise of the police power of the Sovereign to protect the public health, safety, welfare and the **Environment** – the fundamental and foremost responsibility of the State under

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **52** of **63** pages

the West Virginia Constitution[21] -- the West Virginia Supreme Court of Appeals has held that: "Ordinarily, a suit to abate a public nuisance cannot be maintained by an individual in his private capacity, as it is the duty of the proper public officials to vindicate the rights of the public."  *Hark v. Mountain Fork Lumber Co., 127 W. Va. 586, (W.Va. 1945).*

**96.**   At early common law, the bringing of a Public Nuisance Abatement action before the courts was the sole province of the Sovereign and a civil action to abate a Public Nuisance could only be brought in the name of the Sovereign by its duly appointed representative.[22]   Over the ensuing centuries (that included the industrial revolution in England and in this country), the law of standing to bring a Public Nuisance Abatement action before the courts has evolved into the rule of law that has been and remains an integral part of West Virginia Public Nuisance law since statehood; namely, that a Public Nuisance Abatement action should normally be brought only by an authorized officer of the State, though where the authorized officers of the State fail or refuse to bring such an action, consonant with the fundamental principle of West Virginia law that the citizens of this State are its "Sovereign"[23], may a Public Nuisance Abatement action be brought, by a private party with a "special injury" different in kind, not simply in degree, from the injury suffered by the public as a whole.[24]

**97.**   Each Plaintiff herein has suffered, is suffering, and will, in the absence of timely abatement, continue to suffer "special injuries" as a direct result of the Public Nuisance conditions

---

[21]   West Virginia Constitution, Art. III, § 3.

[22]   J. Brighton & A. McBeth, Public Nuisance, the Restatement (Second) of Torts, and Environmental Law, Ecology Law Quarterly, Vol 2, Issue 2 (March 1972).

[23]   West Virginia Constitution, Art. II, § 2.

[24]   *Duff* v. *Morgantown Energy Ass'n*, 187 W. Va. 712, fn 7 (1992); *Davis* v. *Spragg*, 72 W. Va. 672, Syllabus # 2 (1913); *Watts* v. *Norfolk & W. Ry.*, 39 W. Va. 196, 212 (1894); *Talbott* v. *King*, 32 W. Va. 6, Syllabus # 1 (1889); Restatement of the Law, Torts 2nd Ed., §§ 203 and 821C

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **53** of **63** pages

at and emanating from the **Subject Property** and within the **Subject Watershed** alleged herein; all of which "special injuries" are different in kind from those injuries suffered by the public as a whole as a result of those same Public Nuisance conditions:

**(a)** Since it acquired ownership of the **Subject Property** Plaintiff D. C. Chapman Ventures, Inc., as a direct result of the **AMD** toxic contamination of the groundwaters underlying the **Subject Property,** has been and continues to be deprived of the beneficial uses of the surface waters and groundwater to which it, as the fee simple owner of the **Subject Property,** unlike the public as a whole, has a usufructuary right under West Virginia law to reasonably use or support all lawful uses of or on its property. The beneficial uses of the groundwater which Plaintiff D. C. Chapman Ventures, Inc has lost and continues to lose as direct result of the Public Nuisance condition within that groundwater system include its safe use as: **(i)** a potable drinking water; **(ii)** water safe for human dermal-contact; **(iii)** as irrigation water; and **(iv)** a resource that could, without expensive treatment, be available for use in and to support a future residential, commercial, or light industrial use of and on the **Subject Property**.

**(b)** Plaintiff **L4C**, as the holder of an irrevocable option to purchase the **Subject Property** has an equitable interest in the **Subject Property** and the concomitant legal right to protect that real property and the value of all its future uses. As a result of the Public Nuisance conditions on and emanating from the **Subject Property** and the failure or refusal of each Defendant to those same Public Nuisance conditions for which they are jointly and severally liable, Plaintiff **L4C**, unlike the public as a whole, is and will continue to injured the loss of the ability to use its optioned real property for the commercial purposes that real property

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **54** of **63** pages

would support absent those Public Nuisance conditions, and for the loss of the current value[25] of those lost future uses of the real property as a result of the unabated Public Nuisance conditions on and emanating from the **Subject Property**.

**(c)**   Plaintiff D. C. Chapman Ventures, Inc., as the current fee simple owner of the **Subject Property**, and despite the fact that it never owned or operated any mining **Facilities** of the **Subject Property**, never authorized any use of the **Subject Property** for mining or any other commercial activities that could in any way contribute to the Public Nuisance conditions on the **Subject Property** and within the **Subject Watershed**, and never received any royalties or profit of any kind as a result of the past mining operations on the **Subject Property**, is, unlike the public as a whole, injured by the Public Nuisance conditions at and emanating from that property because it faces potential strict liability under federal and state environmental and public health protection laws for the abatement of the Public Nuisance conditions on and emanating from that property.

**(d)**   Plaintiff **L4C**, unlike the public as a whole, is injured by the Public Nuisance conditions at and emanating from the **Subject Property** because those same unabated Public Nuisance conditions impair:  **(i)** the current value of its equitable interest in the **Subject Property** (*i.e.,* the current value of its existing, irrevocable option to purchase that property, which option by its terms is freely assignable and fully marketable); and **(ii)** the value of the **Subject Property** in which it holds an irrevocable, equitable interest.

---

[25]  In the real estate re-development industry, the current value of a future commercial use of the property, based the projected future income stream from that use of the property, has a significant, current collateral value which can be utilized to raise the capital necessary to re-develop distressed or environmentally impaired property.  Defendants failure and refusal to honor their legal obligations timely and properly to abate the significant Public Nuisance conditions on the **Subject Property** significantly reduces the current collateral value of those uses and, thereby, renders redevelopment and re-purposing of the **Subject Property** significantly more difficult and expensive.

**98.**   The aforementioned acts and omissions of the Defendants caused or contributed to the underlined continuing *Per Se* Public Nuisance conditions within the **Subject Watershed.**   These quintessential Public Nuisance conditions within the **Subject Watershed** alleged herein are:  **(a)** seriously injurious to "Waters of the State," all of which are a publicly-owned natural resource held in trust by the State of West Virginia for the use and benefit of present and future generations of the Public; **(b)** constitutes an unreasonable interference with the free use and enjoyment of such "Waters of the State" within the **Subject Watershed**; and **(c)** is injurious to the proper and healthful functioning of the **Environment** within the **Subject Watershed** and offensive to the senses, such that an ordinary person would reasonably be annoyed or disturbed by such condition.

**99.**   Under the common law of West Virginia as articulated by the West Virginia Supreme Court of Appeals in *State ex rel. Smith* v. *Kermit Lumber & Pressure Treating Co.*, 200 W.Va. 221, 488 S.E.2d 901 (1997), the object of the Public Nuisance Abatement action is to abate the harms or unacceptable endangerments to the public health, safety, and **Environment**, not just the act(s) triggering any such harm or endangerment.  An action for *Per Se* Public Nuisance Abatement stands until the harm or endangerments declared to be dangerous to the public health, safety, welfare and the **Environment** are appropriately abated.

**100.**  Pursuant to the West Virginia common law applicable to the abatement of *Per Se* Public Nuisance, Plaintiff **L4C** is entitled to an Order of this Court requiring each of the Defendants, jointly and severally, and subject to appropriate oversight and monitoring by Plaintiff:  **(a)** to undertake at their sole cost a Remedial Investigation and Feasibility Study ("**RI/FS**") of the **Subject Watershed** in full compliance with the applicable requirements of the **NCP, (b)** timely and competently to implement at their sole cost such immediate or interim removal or remedial actions as the Court may determine to be necessary and proper to appropriate abatement of any

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **56** of **63** pages

public nuisance condition(s) or imminent and substantial endangerments to health or the **Environment** within the **Subject Watershed**; **(c)** following filing of the required final **RI/FS** report with this Court, and after conduct of such hearings as the Court determines to be appropriate, to timely and competently implement at their sole cost the Remedial Action Plan, if any, for the **Subject Watershed** selected and approved by the Court.

## COUNT FOUR
### JUDICIAL ABATEMENT OF A CONTINUING PUBLIC NUISANCE PURSUANT TO THE COMMON LAW OF WEST VIRGINIA
### (*Both Plaintiffs against all Defendants*)

**101.**  Plaintiffs **L4C** and **D. C. Chapman Ventures, Inc.** incorporate and reallege in this Count all of the allegations asserted in the foregoing paragraphs as if fully set forth herein.

**102.**  Under West Virginia law, a Public Nuisance is "an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons." *Hark v. Mountain Fork Lumber Co.,* 127 W.Va. 586, 595-96 (1945).

**103.**  The Restatement (Second) of Torts § 82lB, which has been cited as articulative of the common law of West Virginia by the West Virginia Supreme Court of Appeals in *Hedricks* v. *Stalnaker*, 181 W. Va. 31 (1989) and *Duff* v. *Morgantown Energy Ass'n.*, 187 W. Va. 712 (1992) defines a public nuisance as "an unreasonable interference with a right common to the general public."

**104.**  Where a condition "is shown by facts and circumstances to constitute a nuisance affecting public health 'no measure of necessity, usefulness or public benefit will protect it from the unflinching condemnation of the law."' *Board of Com'rs of Ohio County v. Elm Grove Mining Co.*, 122 W.Va. 442, 9 S.E.2d 813, 817 (W.Va. 1940) (quoting 1 Wood on Nuisances, 3d Ed., §19); *Respublica v. Caldwell*, 1 U.S. 150 (1785).

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **57** of **63** pages

**105.**  The West Virginia Supreme Court of Appeals has described Public Nuisance generally under the common law of West Virginia as "the doing of or the failure to do something that injuriously affects the safety, health, or morals of the public, or works some substantial annoyance, inconvenience, or injury to the public[.] (footnotes omitted)".  *State, ex rel. Smith* v. *Kermit Lumber & Pressure Treating Co.*, 200 W. Va. 221, 245 (1997) at fn. 28.

**106.**  The West Virginia Supreme Court of Appeals in *State, ex rel. Smith* v. *Kermit Lumber & Pressure Treating Co.*, 200 W. Va. 221, 245 (1997) explicitly recognized that a Public Nuisance arising from environmental contamination can take the form of both an "endangerment to the public health [and] safety" and physical harm to environmental media ("in the soil and . . . the waters of this State"). 200 W.Va. at 245, 488 S.E.2d at 925 (emphasis added).

**107.**  The seriousness of the harm and of the unacceptable endangerments to the public health, safety, welfare and the **Environment** caused by the noxious and offensive Public Nuisance conditions within the **Subject Watershed** alleged herein cannot be justified under West Virginia law, and substantially outweigh, any claimed social utility of the past coal mining conduct of Defendants.

**108.**  The conduct of the Defendants in the operation of each of their **Facilities** on the **Subject Property** alleged herein is and was a substantial factor in causing and contributing to the condition of a <u>continuing</u> Public Nuisance in the **Subject Watershed** alleged herein.

**109.**  For the reasons alleged in Paragraph 97 of this Complaint, each Plaintiff has suffered and is suffering a "special injury" as a result of the common law Public Nuisance conditions alleged herein, which injury is different in kind, not simply in degree from the harm suffered by public as a whole.

**110.**  The aforementioned acts and omissions of the Defendants caused or contributed to the

continuing common law Public Nuisance conditions within the **Subject Watershed.**  These

quintessential Public Nuisance conditions within the **Subject Watershed** alleged herein are:  **(a)**

seriously injurious to "Waters of the State," all of which are a publicly-owned natural resource

held in trust by the State of West Virginia for the use and benefit of present and future generations

of the Public; **(b)** constitutes an unreasonable interference with the free use and enjoyment of such

"Waters of the State" within the **Subject Watershed**; and **(c)** is injurious to the proper and

healthful functioning of the **Environment** within the **Subject Watershed** and offensive to the

senses, such that an ordinary person would reasonably be annoyed or disturbed by such condition.

   **111.** Each Defendant is strictly liable, jointly and severally, for the timely and appropriate

abatement of the Public Nuisance condition in the **Subject Watershed** because each is:  **(a)** a

person that, by their acts and omissions as a former Owner or Operator of coal mining's **Facilities**

in the **Subject Watershed** created, contributed to, or maintained the continuing condition of Public

Nuisance alleged herein; and **(b)** a "person" that, regardless of actual knowledge of the existence

or nature of the nuisance condition, failed or refused to abate the Public Nuisance.

   **112.**  Because the Public Nuisance conditions at and emanating from the **Subject Property**

and within the **Subject Watershed** arise out of and result from the **Release** of **Hazardous**

**Substances** into the **Environment**, the abatement of that Public Nuisance should be undertaken

by the Defendants, jointly and severally, and at their sole cost in full compliance with the Orders

of this Court and in a manner consistent with the National Oil and Hazardous Substances Pollution

Contingency Plan, 40 C.F.R., Part 300.


### **COUNT FOUR:**
### **UNJUST ENRICHMENT**
### *(Plaintiff Living Lands, LLC against all Defendants)*

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **59** of **63** pages

**113.** Plaintiff **L4C** incorporates and realleges in this Count all of the allegations asserted in the foregoing paragraphs as if fully set forth herein.

**114.** Defendants have failed to perform or fund the necessary and proper abatement and remediation actions in the **Subject Watershed** necessary and proper to **Respond** to the Public Nuisance conditions alleged herein.

**115.** Plaintiff **L4C**, as the holder of an irrevocable option to purchase fee simple title to the **Subject Property**, has an equitable interest in that real property and the legal right to protect that real property and the value of its equitable interest in that real property. In addition, pursuant to Paragraph 7 of its Option Agreement with D. C. Chapman Ventures, Inc. (attached as **Exhibit 1**), Plaintiff **L4C** is the assignee of the rights of the fee simple owner to recover and retain damages "arising, directly or indirectly out of: **(a)** any condition of private nuisance or public nuisance, or any adverse environmental conditions at, emanating from, or adversely impacting in anyway the present or future beneficial uses of the Property, or **(b)** any condition at or affecting the Property that may present an endangerment to the public health, safety, welfare or the environment."

**116.** By undertaking necessary **Responses** to, including necessary investigations into the nature and extent of, the Public Nuisance conditions at and emanating from the **Subject Property** and within the **Subject Watershed** alleged herein, Plaintiff **L4C** has incurred necessary expense to protect its interest in the **Subject Property** and in so doing has conferred and is conferring an economic benefit on each of the Defendants in consequence of the interest of each Defendant in that same property, which interest arises from each Defendant's liability, jointly and severally, for the timely and competent investigation and abatement of the Public Nuisance conditions that they each created, contributed to, or maintained.

**117.** Plaintiff **L4C's** expenditure of funds to investigate and **Respond** to the Public Nuisance

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **60** of **63** pages

conditions in **the Watershed** alleged herein, which would otherwise be Defendants' obligation to fully fund or perform, has unjustly enriched Defendants.

## VI.   *PRAYER FOR RELIEF*:

WHEREFORE, Plaintiffs respectfully requests that this Court award the following relief to each Plaintiff with respect to the causes of action asserted by each Plaintiff:

**A.**  Pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), an award to Plaintiff **L4C** of lump sum judgement against each of Defendants, jointly and severally, for all costs Plaintiff **L4C** has incurred consistent with the **NCP** to **Respond** to the **Release** and threatened **Release** of **Hazardous Substances** at and emanating from the **Subject Property** and within the **Subject Watershed**, together with all prejudgment interest accrued on that sum the same rate as is specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of the Internal Revenue Code of 1954;

**B.**  Pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g), entry of a declaratory judgment on the liability of each Defendant, jointly and severally, for costs incurred by Plaintiff **L4C** to **Respond** to the **Release** and threatened **Release** of **Hazardous Substance** at and emanating from the **Subject Property** and within the **Subject Watershed** consistent with the **NCP** and the Orders of this Court that will be binding on any subsequent action or actions to recover further **Response** costs;

**C.**  Pursuant to RCRA § 7002(a)(1)(b), 42 U.S.C. § 6972(a)(1)(B) and the West Virginia common law of Public Nuisance Abatement, an Order of this Court requiring each of the Defendants, jointly and severally, and subject to appropriate oversight and monitoring by Plaintiff **L4C**:  **(a)** to undertake at their sole cost a Remedial Investigation and Feasibility Study ("**RI/FS**")

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **61** of **63** pages

of the **Subject Property** and the **Subject Watershed** in full compliance with the applicable requirements of the **NCP**, **(b)** timely and competently to implement at their sole cost such immediate or interim removal or remedial actions as the Court may determine to be necessary and proper to appropriate abatement of any Public Nuisance condition(s) or imminent and substantial endangerments to health or the **Environment** within the **Subject Watershed**; **(c)** following filing of the required final **RI/FS** report with this Court, and after conduct of such hearings as the Court determines to be appropriate, to timely and competently implement at their sole cost the Remedial Action Plan, if any, for the **Subject Watershed** selected and approved by the Court;

     **D.**   Pursuant to Federal Rule of Civil Procedure 53 and in furtherance of the goals of timely and effective implementation of the complex and continuing mandatory injunctive relief required herein as set forth in this Court's holding in *Ohio Valley Envtl. Coal.* v. *Fola Coal Co., LLC*, Case No. 2:15-cv-01371 (S.D. WV) (Chamber, C.J.) (September 27, 2017 Order on Plaintiff's Motion for Appointment of a Special Master), entry of an Order of Reference to a Special Master appointed by this Court and authorized:  **(i)** to see to the timely and effective implementation of this Court's Orders herein; **(ii)** to adjudicate in the first instance any disputes between the parties regarding implementation of this Court's Orders and any requests for contempt sanctions and to make a Report to the Court reflecting the Special Master's Findings of Fact, Conclusions of Law and Recommended Order respecting each such adjudication, which Order will be binding upon all parties unless application to this Court for review of such Order is timely filed or such Order is modified or vacated by this Court;

     **E.**   Pursuant to RCRA § 7002(e), 42 U.S.C. § 6972(e), an award to Plaintiff **L4C** and against each of the Defendants, jointly and severally, of Plaintiff **L4C's** costs of this litigation (including reasonable attorney's and expert witness fees and expenses);

*LIVING LANDS, LLC, et al.* v. *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **62** of **63** pages

F.   Pursuant to the West Virginia common law of Unjust Enrichment, an award to Plaintiff **L4C** and against each Defendant, jointly and severally, of an equitable Order for Restitution for all reasonable sums, specifically including all technical, legal and other consulting costs, Plaintiff **L4C** has incurred and will incur to investigate and **Respond** to the Public Nuisance conditions at and emanating from the **Subject Property** and within the **Subject Watershed** alleged herein, which would otherwise be Defendants' obligation fully to fund or perform.

G.   As to all Defendants, jointly and severally, an award to Plaintiff **L4C** of prejudgment interest, pursuant to West Virginia law;

H.   Such other and further relief as this Court deems necessary and appropriate.

**Plaintiffs** respectfully requests that this Court retain continuing jurisdiction over this action to the extent necessary and for as long as necessary to enforce and interpret, and to secure and review the Defendants' compliance with such Order that this Court may enter herein.

Respectfully submitted,

**Living Lands, LLC**
&
**D. C. Chapman Ventures, Inc.** (only with respect to the prosecution of the claims asserted herein, which it has authorized to be brought in its name by Living Lands, LLC)

By: /s/ Michael O. Callaghan_____
Michael O. Callaghan  (WV Bar No. 5509)

NEELY & CALLAGHAN
159 Summers Street
Charleston, WV  25301
Telephone:  (304) 343-6500
Facsimile:  (304) 343-6528
E-Mail:  mcallaghan@neelycallaghan.com

**Co-Lead Trial Counsel for Plaintiffs**

*LIVING LANDS, LLC, et al.* **v.** *JACK CLINE, et al.*, (S.D WV)
**Complaint**
Page **63** of **63** pages